SAINT NICHOLAS CATHEDRAL OF THE RUSSIAN ORTHODOX CHURCH IN NORTH AMERICA, Appellant, *v.* JOHN KEDROFF and BENJAMIN FEDCHENKOFF, as Archbishop of the Archdiocese of North America and the Aleutian Islands of the Russian Orthodox Greek Catholic Church, Respondents.

Argued June 1, 1950; decided November 30, 1950.

*Ralph Montgomery Arkush* for appellant. I. Article 5-C of the Religious Corporations Law applies to plaintiff. (*People ex rel. Westchester Fire Ins. Co.* v. *Davenport,* 91 N. Y. 574.) II. Article 5-C, construed as contended for by plaintiff, is within the competence of the Legislature. (*State* v. *Powell,* 58 Ohio St. 324; *Robertson* v. *Bullions,* 11 N. Y. 243; *Baptist Church in Hartford* v. *Witherell,* 3 Paige Ch. 296; *Parish of Bellport* v. *Tooker,* 29 Barb. 256; *Petty* v. *Tooker,* 21 N. Y. 267; *Westminster Presbyt. Church* v. *Trustees of Presbytery,* 142 App. Div. 855; *Matter of Third M. E. Church,* 67 Hun 86; *State ex rel. Barry* v. *Getty,* 69 Conn. 286; *Krauczunas* v. *Hoban,* 221 Pa. 213.) III. The principles of *Watson* v. *Jones* (13 Wall. [U. S.] 679) are not to be read into the constitutional restraints on legislative action. (*Westminster Presbyt. Church* v. *Trustees of Presbytery,* 142 App. Div. 855; *Girard* v. *Philadelphia,* 7 Wall. [U. S.] 1; *Canovaro* v. *Brothers of Hermits of St. Augustine,* 326 Pa. 76.) IV. The Legislature is deemed to have found that the top Moscow hierarchy is dominated by the Soviet Government. (*Matter of Reuss,* 196 Misc. 24; *Matter of Frankel,* 196 Misc. 268; *Lapchak* v. *Baker,* 298 N. Y. 89; *East New York Sav. Bank* v. *Hahn,* 293 N. Y. 622; *Merit Oil Co.* v. *Director of Necessaries,* 319 Mass. 301.)

*Philip Adler* for respondents. I. Plaintiff has no claim on the merits. Plaintiff is acting on behalf of a group that has seceded from the Russian Orthodox Church and thus has lost all right in the cathedral. (*Watson* v. *Jones,* 13 Wall. [U. S.] 679; *Connitt* v. *Reformed Prot. Dutch Church of New Prospect,* 54 N. Y. 551; *Trustees of Presbytery of N. Y.* v. *Westminster Presbyt. Church,* 222 N. Y. 305; *McGuire* v. *Trustees of St. Patrick's Cathedral,* 54 Hun 207; *Rector of St. James Church* v. *Huntington,* 82 Hun 125.) II. Article 5-C of the Religious Corporations Law, with or without the amendment, does not

apply to St. Nicholas Cathedral. The statute does not transfer the use of St. Nicholas Cathedral from the patriarchal church to the metropolitan district. (*Shielcrawt* v. *Moffett*, 294 N. Y. 180; *Geneva & Waterloo Ry. Co.* v. *New York Central & H. R. R. R. Co.*, 163 N. Y. 228.) III. Article 5-C of the Religious Corporations Law, as construed by plaintiff, would violate the First and Fourteenth Amendments to the United States Constitution and section 3 of article I of the New York Constitution. (*Illinois ex rel. McCollum* v. *Board of Educ.*, 333 U. S. 203; *Everson* v. *Board of Educ.*, 330 U. S. 1; *Murdock* v. *Pennsylvania*, 319 U. S. 105; *West Virginia State Bd. of Educ.* v. *Barnette*, 319 U. S. 624; *Drozda* v. *Bassos*, 260 App. Div. 408; *Marsh* v. *Alabama*, 326 U. S. 501; *Busey* v. *District of Columbia*, 138 F. 2d 592; *Terminiello* v. *City of Chicago*, 337 U. S. 1.)

CONWAY, J. In 1903, a church was built at 15 East 97th Street in New York City, title to which was held by a corporation, created in 1899 under the Religious Corporations Law of this State and named " Russian Orthodox St. Nicholas Church in New York ". The church was constructed with funds supplied partly from abroad and partly from local contributions and it was dedicated to the use of the members of the local congregation of the Russian Orthodox Church in New York City established in 1893. Two years later in 1905, the See of the Russian Orthodox Diocese of North America and the Aleutian Islands was transferred from San Francisco to New York and St. Nicholas Church became a cathedral occupied by the ruling bishop of the North American Diocese and dedicated to the use of all the members of the diocese as a central place of worship of the Russian Orthodox Church in North America. This cathedral is the subject of the present controversy. Simply stated, it is our duty in this action to identify the true and proper beneficiaries at the present time of such dedication of the cathedral so that there may be proper administration of this religious trust. In approaching that task, it is vital to our inquiry that we understand the history and organization of the Russian Orthodox Church, and the origins of its difficulties in modern times as disclosed in the record here and the record in *Kedrovsky* v. *Rojdesvensky* (242 N. Y. 547), which was submitted to us upon the argument.

The Russian Orthodox Church is one of that loosely knit group which generically is referred to as the Eastern Confession or the Eastern Orthodox Church — an allusion to the rupture of the eastern and western portions of the Catholic church in 1054. The Russian church originally was subject to the Patriarch of Constantinople but acquired greater autonomy when Constantinople fell to the Turks and the Metropolitan of Moscow was no longer appointed by the Patriarch of Constantinople but was elected by the Russian bishops. Finally, express recognition of the " autocephaly ", i.e., the complete independence, of the Russian church came in the 16th century when the Metropolitan of Moscow was raised to the dignity of Patriarch. The Patriarch ruled the church until 1700 when Peter the Great forbade the election of a new Patriarch and established the Most Sacred Governing Synod, consisting of a Procurator appointed by the Czar, and several metropolitans and bishops, to govern the church in place of the Patriarch. This form of church government continued for over two hundred years until 1917.

During that period, the Russian Orthodox Church conducted missionary activities in many parts of the world. A mission was established in 1793 in the then Russian territory of Alaska, and spread down the Pacfic coast. In 1870, the mission had grown to the extent that the Diocese of Alaska and the Aleutian Islands was created with its See at San Francisco. Since it extended from Alaska through Canada to San Francisco, we shall refer to it herein as the North American Diocese or as the diocese.

A New York City congregation of the Russian Orthodox Church was established in 1893, incorporated in 1899, as already noted, and completed St. Nicholas Church in 1903. In 1905, when the See of the diocese was moved from San Francisco to New York, the church became a cathedral occupied, in accordance with the rules of the church, by the ruling bishop of the diocese. Throughout that period, the paramount jurisdiction of the Most Sacred Governing Synod in Russia over the North American Diocese was recognized and unquestioned.

Such was the condition of the Russian Orthodox Church and its North American Diocese until 1917 — the year of the Kerensky revolution in Russia.

Following the overthrow of the czarist regime, a great " Sobor " or convention of the Russian Orthodox Church was called. This sobor of 1917–18, it is conceded here by all parties, had indisputable canonicity and validity. The sobor re-established the Patriarchate and elected thereto Patriarch Tikhon, the " arch-prelate " and " head of Church Administration ", the first such since Peter the Great. The Patriarch, as the head of the Sacred Synod and of the Supreme Church Council, constituted the Supreme Church Authority and ruled the Russian Orthodox Church. Other enactments of the sobor provided a procedure for the local election of diocesan bishops and the confirmation of such election by the Supreme Church Authority. It also provided that the Patriarch might call a sobor every three years and that he should preside over it. No sobor was ever called by Patriarch Tikhon (and he was the only one with power to do so) prior to his death in 1925.

Up to 1917, the ruling archbishop of the diocese had been appointed by the central church authorities. Tikhon himself, later to be Patriarch, was the diocesan archbishop from 1904 to 1907. Archbishop Platon succeeded him and ruled until 1914 when he returned to Russia and Archbishop Evdokim came in his stead. Archbishop Evdokim remained until 1917 when he too returned to Russia. All three duly appointed archbishops, in conformity with the rules of the Russian church, used and occupied St. Nicholas Cathedral as their administrative headquarters and as a place of worship. Those three archbishops were in proper and direct canonical succession and as to that there is no controversy.

Archbishop Evdokim's departure in 1917 marked the beginning of the difficulties which have ever since beset the diocese. No discussion of the Russian Orthodox Church since 1917 is possible without constant reference to the political conditions upon which its character and its existence depended. In March of 1917, the Provisional Government of Kerensky replaced the czarist regime. The Kerensky Government itself was soon overthrown by the so-called Bolsheviki led by Lenin in the famous " October Revolution ". Prior to his downfall, Kerensky, as noted, had authorized the convocation of the great sobor of the Russian Orthodox Church, which was in session through the latter part of 1917 and up to February of 1918 and which named

Tikhon as Patriarch. Upon their accession to power, the Bolsheviki, in accordance with the then acknowledged and asserted principles of communism, attempted by every means at their command to destroy religion in Russia. In the years following 1917, church property was confiscated, clergymen were killed, exiled or imprisoned, and Patriarch Tikhon himself, old and in poor health but a useful symbol, too valuable to be destroyed, was confined under house arrest and later imprisoned.

This frontal attack upon the church continued for five years. In November of 1920, however, at the height of the persecution, Patriarch Tikhon issued his now famous ukase No. 362 of 1920. This document contained '' instructions to the Diocesan Bishops for the case that a given Diocese be severed from the highest Church Administration, *or in case the latter's activity stop*''. (Emphasis supplied.) It was provided in part that '' if the highest Church Administration * * * would for any reason discontinue their church-administrative activity '', the diocesan bishop, either with the bishops of neighboring dioceses or, if that were not possible alone, should '' assume the full hierarchical power '' and '' do everything possible to regulate the local church life, and if necessary * * * organize the diocesan administration suitable to conditions created ''. Other paragraphs provided for the continuation of such local administration of the church if the discontinuance of activity of the highest church administration '' should acquire a protracted or even permanent character ''. Finally, it was provided that '' all measures that were taken locally in accordance with the present instructions * * * must be submitted for confirmation later to the Central Church Authority when it is re-established.''

The apparent forebodings of Patriarch Tikhon, which prompted this ukase, proved accurate, for in the spring of 1922 he was arrested and imprisoned. The Russian Government, then, for its own purposes, as later became evident, permitted a group of priests to visit Tikhon and they procured from him a letter authorizing the transfer of certain *business papers* of the church to a named archbishop (Agathangel) who was to be his representative. Instead of doing that, the recipients of the letter — members of a radical group styling themselves the '' Living '' or '' Renovated '' church — declared themselves to be the Supreme Authority of the Russian Orthodox Church and

purported to authorize and summon the pseudo-sobor of 1923. Patriarch Tikhon later referred to them as " ambitious and wilful men " who took advantage of the situation " to usurp the highest clerical power of the Orthodox Russian Church which did not belong to them ", and he denounced their statements as " nothing but lies and deception ". It is now conceded here that this was a schism which is now extinct. Nevertheless, while Tikhon was still in prison, this schismatic group purported to call another sobor of the church although power so to do resided only in the Patriarch Tikhon, as we have seen. There is evidence that they were aided and abetted in their plan by the Russian Government which permitted them to proceed while killing, arresting or exiling those members of the church who objected. This new pseudo-sobor met in 1923.[1] Tikhon was roundly and vehemently condemned by all the speakers. The patriarchate was dissolved and Tikhon, reviled and denounced as an apostate and traitor, was unfrocked. The church created by the pseudo-sobor of 1923 was called the " Living Church " or the " Renovated Church ". It was schismatic and had no canonical validity. That fact, it should again be noted, is conceded by all the interested parties here.

The turmoil and the turbulence with which the Russian Orthodox Church was beset in Russia was not without its echoes in this country. Bishop Alexander of Canada became acting head of the diocese by designation of Archbishop Evdokim (see p. 6, herein). Several conventions were held in this country at which the status and fate of the North American Diocese were discussed and measures were proposed to preserve it from dis-

---

[1] The minutes of its deliberations contain frequent obsequious expressions of praise of and devotion to the Soviet Government. Lenin was referred to as " the world's leader " and the Soviet Government was said to be "the only one in the world of all time of the existence of mankind, to fight actually for good and equality." A resolution was adopted which declared that the world was divided into two classes — the capitalist exploiters and the proletariat — and continued: " The Christians cannot be indifferent spectators of that battle. The Sobor declares capitalism to be a mortal sin, and a battle with capitalism to be holy to Christians. In Soviet Authorities the Sobor sees a world's leader for fraternity, equality and peace of nations. The Sobor stigmatizes the international and national counter-revolution and condemns it with all its religious and moral authority." Christians " through the entire world " were called upon to " bring into life the principles of the October Revolution."

integration or the usurpation of pretenders. Archbishop Platon, who had ruled the diocese from 1907 to 1914, in proper canonical succession, returned to this country in 1921. He succeeded in restoring peace and order in the diocese, and prominent churchmen of the diocese urgently petitioned Patriarch Tikhon to reappoint him formally as archbishop of the diocese. This was just before Tikhon was actually imprisoned. While he was technically at liberty, his visitors in Moscow were being watched and interrogated carefully, and his correspondence, especially with Americans, was systematically searched. The American entreaties regarding Archbishop Platon were relayed to the Patriarch by a representative of the Y.M.C.A. who was in Moscow. The Patriarch, in the presence of another witness, Bishop Pashhovsky, assured him that Platon would be appointed the ruling bishop of the diocese and that he would issue papers to that effect. The Patriarch asked that Platon be notified immediately, but it was agreed that it would not be possible at that moment to put the appointment in writing because of the constant surveillance of the civil authorities and the fear that any such communication, if seized, would endanger the safety or the life of the Patriarch. The Patriarch's intention and will were transmitted to Archbishop Platon by the Y.M.C.A. representative and Bishop Pashhovsky. Alexander, the acting archbishop, recognized in writing Platon's appointment as ruling bishop of the diocese, as did the bishops of the church outside Russia. Tikhon was imprisoned by the Soviet Government immediately after making this oral appointment. A diocesan convention was held at Pittsburgh in October, 1922, and after investigating the situation Platon was acknowledged as the ruling bishop. Platon accordingly took possession of St. Nicholas Cathedral and exercised administrative supervision over the diocese.

Patriarch Tikhon was released from prison in the latter part of 1923, after the pseudo-sobor of that year had completed its work. Under date of September 20, 1923, from a monastery, he signed an order directed to Platon advising him that, *with the concurrence of the Sacred Synod,* '' having taken cognizance of the situation of the American Church we deemed it necessary to appoint you to rule the North American Church ''.

Meanwhile, one John Kedrovsky, a priest of the Russian Orthodox Church in this country, had, in 1918, commenced an action in this State on behalf of himself and other priests against the association or corporation known as the Archbishop and Consistory, which was a managing and advisory group handling the affairs of the diocese. In that complaint Kedrovsky asserted that he was one of the clergy of the Russian Orthodox Greek Catholic Church of North America; that it was a religious denomination of about 300 churches with about 300,000 members organized in various unincorporated parishes or bodies throughout North America [2]; that his lawful archbishop was Archbishop Evdokim (Meschersky) who had departed from the United States for Russia about August 6, 1917, and had since remained there; that Alexander (Nemolovsky) was then a bishop of the church in Canada and had been assuming to act as the acting archbishop of the church pursuant to a cablegram from the lawful Archbishop Evdokim but that in truth no such appointment had been made by Archbishop Evdokim and that Alexander was therefore a usurper.

After the institution of that action, but before trial, the aforementioned psuedo-sobor of 1923 was held in Moscow. It created the "Living Church" or "Renovated Church", which, as noted, is now conceded to have been schismatic and uncanonical. Kedrovsky, the same priest who in his 1918 action had asserted that he was subject to Archbishop Evdokim as the true archbishop of the North American Diocese, procured from this "Renovated Church" certain credentials in the latter part of 1923. One document purported to consecrate him as North American archbishop and to excommunicate and condemn Archbishop Platon. The other documents contained Kedrovsky's formal appointment as archbishop of the North American Diocese and a full power of attorney to act for the church.

In March, 1924, he commenced another action, this time asserting that he was the lawful archbishop of the North American Diocese, in order to gain control of St. Nicholas Cathedral, the subject premises in the case at bar, which he then conceded had

---

[2] On the trial, he introduced in evidence an exhibit which listed deeds of 135 church properties to Bishop Alexander in Alabama, Alaska, California, Colorado, Connecticut, Illinois, Indiana, Massachusetts, Michigan, Minnesota, New Jersey, New York, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, Texas, Washington and Wisconsin.

been possessed by Bishop Alexander in 1919 " as the de facto or acting archbishop ". As noted, Archbishop Platon was occupying the cathedral in 1924 by virtue of his oral appointment by Patriarch Tikhon and the written confirmation thereof in September, 1923.

In March of 1924, immediately prior to the institution of the cathedral action by Kedrovsky, a document, dated February, 1924, appeared in the newspapers here purporting to have been issued by the Patriarch Tikhon accusing Platon of engaging " in public acts of Counter-Revolution directed against the Soviet power and of disastrous consequences to the Orthodox Church ". It provided for the dismissal of Platon " from the day on which this Present Decision is announced to him ", by a new ruling bishop who was to be chosen. The publication of this decree, dated less than five months after the patriarchal order confirming Platon and the legal action instituted by Kedrovsky, caused bewilderment among the members of the diocese. A North American sobor was called and held at Detroit in April of 1924 to consider the situation, excerpts from the minutes of which appear in the record.[3]

---

[3] The purported new order of the Patriarch was compared with his recent decree confirming Archbishop Platon, the language of the new order was analyzed and found to be couched in terms similar to those used by the schismatic Kedrovsky, and there were comments upon the very serious condition of the Patriarch's health. (He did, in fact, die the next year, in April of 1925.) It was concluded that " somebody in Moscow is extracting decrees from the sick Patriarch and is using those decrees against him ", and in particular that the decree of February, 1924, was " undoubtedly forced by the Soviet power ". Another speaker stated : " The fact that the Soviet power still tolerates Patriarch Tikhon is only because he is an achievable means of influencing opinion at home and public opinion abroad. I have not the slightest doubt that all that the Patriarch now does to administer the Patriarchate he is doing under duress. Over there it is done very simply : he is summoned to the respective commissariat and presented with decrees prepared beforehand which he is ' to execute '. As everything is done to 'consolidate the conquests of the revolution' his refusal to comply with the demands of the Soviet power will be openly called counter-revolution and sabotage." It was said that if such forced acts of the Patriarch continued, the North American Diocese would be subject to " all kinds of surprises, which could basically undermine that church order and peace which have with such great labor already been practically arranged " by Archbishop Platon, and " would involve our Church here in a condition of that same anarchy under the banner of which church life in Russia exists at present * * *. We must create our own firm Church administration, completely insured against possibility of the direct or indirect influence of the Soviet power."

It was pointed out that the North American Diocese, for a good many years, had been '' cut off from the highest organ of the administration of the Russian Church '' and that that situation made operative the above-quoted ukase of 1920 providing for local administration and election of bishops. The sobor then adopted resolutions asking Platon to head the administration of the church. Another resolution emphatically stated it to be the will of the sobor '' not to break at all the spiritual ties and communion with the Russian Church, but always to pray for her good ''. The '' final regulation '' of the status of the North American church was to be left to '' a future Sobor of the Russian Orthodox Church which will be legally convoked, legally elected, will sit with the participation of representatives of the American Church under conditions of political freedom, guaranteeing the fullness and authority of its decisions for the entire Church, and will be recognized by the entire Oecumenical Orthodox Church as a true Sobor of the Russian Orthodox Church.''

The second or 1924 action brought by John S. Kedrovsky reached us two years before the 1918 action brought by him. In that 1924 action there was evidence as to most of the facts already detailed. However it was not there conceded as it is now that the '' Renovated Church '' had been schismatic in origin and had been later absorbed by or merged with the patriarchal church nor that the 1923 sobor was not considered as having complied with canonical requirements because it was not convened pursuant to a call by the Patriarch and the Holy Synod. Moreover, in that action there was not before the court ukase No. 362 of 1920 of Patriarch Tikhon. The Appellate Division (214 App. Div. 483) stated that '' The validity of Kedrovsky's appointment really depends upon the validity of the second Sobor [that of 1923] as it is called.'' (P. 487.) It then found (contrary to what is now conceded to be the fact) that the sobor was properly called and that the '' Renovated Church '', created by it, had the power to appoint Kedrovsky as the ruling bishop of the North American Diocese. When the appeal from that decision reached us we treated it as one involving only questions of fact as to whether (1) there was a governing body of the church and whether (2) that governing body had recognized Kedrovsky as archbishop of the church. We determined that there was evidence to sustain the findings of the Appellate Divi-

sion on both of those points. We thereupon affirmed the judgment, one Associate Judge being recorded as absent. (*Kedrovsky* v. *Rojdesvensky,* 242 N. Y. 547 [1926].) The control of all phases of Russian life by the Government was not as apparent in 1924 as it is a quarter of a century later and on the surface, at least, the case appeared to be a proper one for the application of the rule that in an ecclesiastical dispute involving a denominational church, the decision of the highest church judicatories will be accepted as final and conclusive by the civil courts (*Trustees of Presbytery of N. Y.* v. *Westminster Presbyt. Church,* 222 N. Y. 305, 315; *Watson* v. *Jones,* 13 Wall. [U. S.] 679, 724–727; Religious Corporations Law,.§§ 4, 5).

Two years later there was presented the original or 1918 action commenced by Kedrovsky, as a priest of the patriarchal church, on behalf of himself and all others similar situated. It had been brought against the " Archbishop and Consistory of the Russian Orthodox Greek Catholic Church, alleged corporation ", and others. Archbishop Platon (Rojdesvensky) was again an appellant. In that action a receiver *pendente lite* had been appointed and the judgment at Special Term directed that the defendant Platon and other defendants deliver over to such receiver, who in turn was directed to deliver to plaintiff John S. Kedrovsky, all the properties and deeds thereto held by Bishop Alexander and conveyed by him to the general board of trustees by the exhibit dated June 7, 1921, which listed and enumerated all of the 135 church properties in the 19 States and the Territory of Alaska heretofore referred to. That judgment was unanimously affirmed by the Appellate Division (220 App. Div. 750). We, however, granted leave to appeal. The decision of the Appellate Division there was correct and unassailable if by our affirmance in *Kedrovsky* v. *Rojdesvensky* (242 N. Y. 547, *supra*), we had adopted the view that the properties of the North American Diocese were required to be administered by an appointee of the central authorities of the patriarchal church as it then existed in Russia, whatever the status and characteristics of the church there might be, and that Kedrovsky had been validly appointed by such authorities. We, however, declined so to consider our earlier affirmance in the cathedral case two years before. Realizing that the legitimate claims of the North American Diocese, whose temporary autonomy had but recently been

declared, were entitled to consideration under the circumstances disclosed, we unanimously reversed the judgments below. (*Kedrovsky* v. *Russian Catholic Church*, 249 N. Y. 75 [1928].)

We pointed out that the title to the properties " was either in Archbishop Nemolovsky [Alexander] for the benefit of the faithful of the church within his diocese, or in the defendants [Platon and the general board of trustees] to whom he attempted to transfer his trusts  *  *  *  or in the faithful of the church themselves." (P. 77.) We further noted that in none of those views was title in the members of the Consistory, then headed by Kedrovsky. Then, taking cognizance of the doubt as to Kedrovsky's status as archbishop by appointment of the " Renovated Church ", and of the declaration of administrative autonomy by the American church at Detroit in 1924, we said (pp. 77–78) : " In view of the dissensions that have arisen, the Supreme Court may well conclude that the title should be vested in some other trustee who may be relied upon to carry out more effectively and faithfully the purposes of this religious trust (*Carrier* v. *Carrier*, 226 N. Y. 114). Whether such trustee should be the plaintiff, who is the present Archbishop, or the incorporated Archbishop and Consistory, or some one else, we do not now determine. This question is one to be passed upon by the Supreme Court in its discretionary supervision of the conduct of trustees. That discretion has not been exercised by any judgment yet pronounced.  *  *  * "

That 1928 decision by this court thus recognized that the difficulties of the Russian Orthodox Church in this country differed substantially from the situations presented in the *Westminster* and *Watson* cases (*supra*), and that those cases were not helpful in the solution of the problem. The problem, indeed, was one which strained the limits of judicial power, and we deemed it proper to return the case to the Supreme Court leaving it to that court, after full consideration of the facts, in the exercise of its discretionary power, to achieve a result whereby the faithful of the Russian Orthodox Church in this country might enjoy their accustomed religious temporalities under the supervision of trustees who might " be relied upon to carry out more effectively and faithfully the purposes of this religious trust ".

While this litigation was in progress, the Soviet sponsored " Renovated Church " was the only one permitted to function

in Russia, the central office of the patriarchal church being suppressed by the Government. Despite this State assistance, the '' Renovated Church '' had no popular following and few adherents outside its own clergy. In a few years it joined with and was absorbed by the patriarchal church. For two years, after Tikhon's death in 1925, there was no Patriarch of the Russian Orthodox Church. Then in 1927, one Sergius, the Metropolitan of Moscow, made peace with the Soviet Government and concluded an agreement with it under which the central office of that church was permitted to reopen, after acknowledging its '' loyalty '' to the Government and promising to secure similar written pledges of loyalty from the clergy of the church abroad. No election to fill the office of Patriarch was permitted. Instead, Sergius was appointed the acting *locum tenens* of the patriarchal throne. Unsuccessful discussions subsequently ensued with a view toward reuniting the North American metropolitan district with the patriarchal church.[4]

Under the leadership of Metropolitan Platon following the creation of the administratively autonomous metropolitan district by the Detroit sobor of 1924, to which reference will be made hereafter, the church grew and prospered. With the exception of schismatics such as Kedrovsky, who was recognized by no one but who occupied St. Nicholas Cathedral by virtue of the decision and injunction of 1924, the North American church followed Metropolitan Platon. In 1933, the Acting Locum Tenens, Sergius, dispatched one Benjamin (Fedchenkoff) to the United States in order to take over the administration of the metropolitan district from Platon, whose proclamation of autonomy was declared to be '' null and void ''. Sergius also purported to excommunicate Platon and all the clergy and laymen who followed him, until they submitted themselves to the jurisdiction of the patriarchal Exarch Benjamin (in America) or directly to the Acting Locum Tenens (in Moscow). Finally in

---

[4] The position of the Russian church in America appears to have been that no such pledge of loyalty to the Russian Government as demanded could be given by the clergy here and that the church in Russia was becoming a slave to the atheistic Russian Government and was aiding it in its fight against all religion. In view of those conditions, the Russian church here felt it had no alternative but to insist upon temporary autonomy envisaged by the ukase No. 362 of 1920.

1934, Sergius appointed his ambassador, Benjamin, as " permanent Ruling Bishop of the Russian North American Diocese ". The text of the order contains a recital that Benjamin had " organized in New York a Diocesan Council and that our *North American Diocese has begun official existence.*" (Emphasis supplied.) This would appear to be a significant admission that the former North American Diocese, which had by that time become a metropolitan district, had achieved practical administrative autonomy and that it was necessary for the Russian church to organize a new diocese. By 1945, the number of parishes which recognized the new diocese set up by Benjamin in 1934, and which we must assume, in view of the provisions of the Religious Corporations Law since 1875, were organized for the purpose of adhering to such new diocese set up by Benjamin, was only 13, while those adhering to the autonomous metropolitan district were said to total 358.

Platon died in 1934 and another sobor of the American church convened at Cleveland. Bishop Theophilus (Pashkovsky) was elected as ruling bishop and has served as such since. The temporary autonomy of the North American metropolitan district created in 1924 was reaffirmed, and rules for the administration of parishes were adopted. Another sobor at New York in 1937 again confirmed the temporary autonomy of the North American metropolitan district. The central church authorities in Moscow immediately issued a decree suspending and excommunicating Bishop Theophilus.

In 1934, John S. Kedrovsky, the schismatic, also died, but his son, Nicholas, continued to occupy the St. Nicholas Cathedral, even though by that time the " Renovated Church " had ceased to exist. Nicholas remained there until 1944, when he too died, and possession of the cathedral passed informally to his brother, John, who claimed to be a priest by virtue of an ordination of the " Renovated Church ".

In 1940, the status of the metropolitinate again came before this court in *Waipa* v. *Kushwara* (259 App. Div. 843, motion for leave to appeal denied 283 N. Y. 780). That was a suit to oust a priest from a Russian Orthodox Church in Yonkers, N. Y. He had been suspended by Archbishop Theophilus of the metropolitan district and in the civil action brought against him, he defended on the ground, among others, that Benjamin, the

appointee of the Moscow Patriarchate and not Archbishop Theophilus, the elected metropolitan, had the power and authority to administer the affairs of the church here. The lower courts rejected that contention, finding authority for the creation of the administrative autonomous metropolitan district in the ukase of 1920 of Patriarch Tikhon which was to continue "until such time as the existing civil authorities * * * would cease interfering with the church." (N. Y. L. J., Jan. 6, 1940, p. 97, col. 5.) We denied leave to appeal.

Following the invasion of Russia by Germany in 1941, the Soviet Government, fighting for survival, apparently found it expedient to permit a somewhat broadened area of activity to the Russian Orthodox Church in that country. Then, following the death of Sergius in 1944, it consented to the convening of a sobor at Moscow in January of 1945. The news which was permitted to seep out of Russia after 1941 encouraged the hope in the members of the metropolitan district that unity might again be found.[5]

Suddenly, without advance notice, an invitation was received for the North American church to be represented at the new sobor in Moscow. Four delegates were hurriedly chosen — three clergymen and one layman, the attorney for the church — who made preparations to travel to Alaska, from which place the Russian Government was to provide transportation to Moscow. After two of the clergymen had started, the Soviet Government cancelled the visa of the attorney on the pretext that entry was permitted only to clerical persons — a restriction which was not observed with reference to the delegation from Yugoslavia. The two clergymen who had already left were met by a Russian airplane which was to carry them to Moscow. Instead, they were landed in Siberia and transferred to a train to continue their journey. As a result, they arrived in Moscow ten days after the sobor had adjourned.

They found that one Alexy had been named Patriarch of the Russian Orthodox Church, and they presented to him a report of the church in North America and a request for the lifting of

---

[5] As stated in an official report of the metropolitan district, "It seemed, in form at least, that the mother church was being restored to a position of dignity and usefulness. * * * The time appeared to be ripe for a discussion of the terms on which the two churches might be reunited."

the spiritual separation on terms of autonomy. In return, they were handed a prepared document, the so-called ukase of February, 1945, for delivery to Metropolitan Theophilus. The terms of this ukase were not acceptable to the North American church. Instead of the necessary autonomy, the ukase provided for the calling of a sobor in America to be presided over by an archbishop sent from Russia. The sobor was to be required to declare in the name of the church " its abstention from political activities against the U. S. S. R. and give corresponding orders to all parishes ". There was no comment or provision concerning the status of Metropolitan Theophilus, the elected head of the North American church. Instead, the sobor was to be required to elect a new person to be head of a new metropolitan district. Two representatives of the then Moscow Patriarchate were recommended as candidates for the position, and the right was reserved to refuse confirmation of the person chosen " if he be considered unsuitable by the Patriarchy, for any motivated reason whatsoever ". There was an intimation that " some extended powers " might be given to the person so chosen and confirmed, " but the right to confirm candidates for bishop, the right to reward the clergy with higher titles, and the right of appeal as regards bishops, clergy and others, remain with the Moscow Patriarchy."

A council of the bishops of the North American metropolitan district met in May, 1945, and decided that the terms proposed in the ukase of February, 1945, were not acceptable.[6]

---

[6] In an official report to the clergy and laymen, published in July, there was a full discussion of the background and necessity of the 1924 declaration at Detroit of temporary autonomy for the North American metropolitan district. Reference was made to the recent efforts at unity, the chicanery by which the American delegates were prevented from attending the Moscow sobor, and the substance of the ukase then issued. The report emphasized that the metropolitan district considered itself as part of the Russian church and desired that the suspension be lifted. It was pointed out, however, that the text of the ukase disclosed that the Moscow Patriarchate had " little conception of the conditions of church life in this country, and of the atmosphere of religious and political freedom in which the American Church has developed." Then followed a point-by-point analysis of the ukase. One of the major obstacles was the insistence of the patriarchy upon renunciation of political activities against the U. S. S. R. The report said: " It would be inconsistent with the duties and obligations of loyal American and Canadian citizens, and contrary to the traditional atmosphere of freedom of speech and political action in these

The attempts at reconciliation having met with failure, the metropolitan district decided to commence this action to recover possession of St. Nicholas Cathedral, which by custom and rule had always been the See of the Russian Orthodox Church in North America and the residence and place of worship of the ruling bishop of the church in North America. Technically, the plaintiff in this action is the corporation, '' Saint Nicholas Cathedral of the Russian Orthodox Church of North America ''. When the land for the proposed cathedral was acquired in 1899, title was taken in the name of a religious corporation organized pursuant to the Religious Corporations Law of 1895 (L. 1895, ch. 723, § 50) which provided that the incorporators of such Orthodox churches should be, by virtue of office, the Russian Ambassador and the Consul General. This corporation, so formed, retained title until 1925, with the exception of one year (1916–17) when title was temporarily placed in the name of the then ruling Archbishop Evdokim to whom John S. Kedrovsky, when he brought his 1918 action, was subject as a priest and whom he, in his complaint, recognized as the true head of the North American Diocese.

In 1925, a special act of the New York State Legislature (L. 1925, ch. 463) created the plaintiff corporation, composed of Metropolitan Platon and others of the metropolitan district, to which the old or 1899 corporation transferred the cathedral property. The deed was signed by the Russian Consul General, but not by the other statutory incorporator, the Russian Ambassador, as we did not then recognize the Russian Government in that country. That necessary defect was cured, and all such deeds validated by a subsequent act of our Legislature. (L. 1942, ch. 206.) Moreover, the corporate existence of the plaintiff corporation was specifically confirmed by still another act of our Legislature (L. 1945, ch. 817), '' notwithstanding any nonuser by said corporation of its corporate rights, privileges and

countries, for the Russian Church in America to give the pledge of loyalty to a foreign power which is implicit in the demand of the Patriarchal Ukase.'' Another stumbling block was the vagueness of the ukase as to the powers of the North American church. It was felt that '' the precise nature of the relationship between the two churches should be defined in advance. This is particularly necessary in view of the precarious situation of the mother church, existing as it does by sufferance of a totalitarian regime.''

franchises or the lapse of any period of time during which said corporation was inactive." The plaintiff corporation, accordingly, is the present owner of the record title to St. Nicholas Cathedral. This is not, however, the ordinary ejectment action, in which proof of such title and of an ouster would constitute ground for relief. Since 1875 (L. 1875, ch. 79), our Legislature has provided for the denominational control and administration of church properties and temporalities. (See Religious Corporations Law, § 5.) The corporate owner of the title thus holds the property *in trust* for the religious body for whose use it was dedicated. Plaintiff does not dispute this trust theory, but on the contrary relies upon it. Plaintiff has endeavored to prove that the beneficial use of the property today rightfully belongs to the Russian church in America (Religious Corporations Law, § 105) which was forced to declare its administrative autonomy at the Detroit sobor of 1924 in order to preserve and adhere to those principles and practices fundamental to the Russian Orthodox faith, free from the influence of an atheistic and antireligious foreign civil government.

The action, as stated, was commenced against John Kedroff, the second son of John S. Kedrovsky, in April, 1945. Apparently fearful of his anomalous status, as a cleric of a concededly extinct church (the " Renovated Church "), Kedroff made overtures to Benjamin, the representative of the Moscow Patriarchate, and in October, 1945, was *reordained* by Benjamin and thereupon surrendered the cathedral premises to Benjamin, as head of a new diocese of a different church. We must remember that Benjamin never possessed or occupied the cathedral until after the commencement of this action on April 9, 1945, against the defendant Kedroff. Benjamin was not originally a party herein because he was not an occupant of the cathedral but was later permitted to intervene. Kedroff, the second son of Kedrovsky, was but a priest of the schismatic " Renovated Church " and thus could not have defended this action as an occupant of the cathedral. He therefore went to Benjamin, recognized him as the " Chief Church Authority ", and said " Ordain me all over again " and had himself reordained as a priest by Benjamin in what must have been the latter's new diocese. When Benjamin did so reordain Kedroff as a priest, the latter " gave " the cathedral to Benjamin

according to Benjamin's counsel here. Thereafter, in order to obtain an adjournment in this action, Benjamin stipulated to and did give up possession of the cathedral on June 6, 1947. At the time of the trial, when he was called by the plaintiff *only*, Benjamin was living at 38 Halsey Street in Brooklyn. Benjamin was therefore an occupant of the cathedral only from October, 1945, a time subsequent to the commencement of this action, until June 6, 1947.

Kedroff had interposed a general denial to plaintiff's complaint. After Benjamin, following such surrender by John Kedroff, took over the cathedral, he was permitted to intervene and interposed the present amended answer setting up four affirmative defenses. Only the first need concern us here. The second, third and fourth defenses, i.e., nonuser and lack of authority in plaintiff, the Statute of Limitations and laches, respectively, were either ignored, abandoned or found in plaintiff's favor below. There was little or no discussion concerning them and they have been effectively eliminated from the case. The first affirmative defense sets up Benjamin's appointment and his asserted right to occupy the cathedral by virtue of such appointment to that office.

Before this action was commenced a new article of the Religious Corporations Law, 5-C, was passed by both houses of the New York Legislature. It was subsequently signed by the Governor. This legislation had a conclusive effect upon the issues presented in the case at bar and will be discussed at length below. Quite apart from this legislative action with respect to the specific dispute here involved, we think that, as a matter of common law as intimated by our 1928 decision in *Kedrovsky* v. *Russian Catholic Church* (249 N. Y. 75, *supra*), there was ample basis and room for an exercise of the discretionary power of the Supreme Court over the conduct of trustees, in favor of the North American metropolitan district. We think that in the light of historical facts and the evidence in the records before us, the conclusion would have been fully warranted that the leaders of the North American metropolitan district are the trustees " who may be relied upon to carry out more effectively and faithfully the purposes of this religious trust " (pp. 77–78), i.e., who may administer the temporalities of

St. Nicholas Cathedral for the benefit of the faithful for whose use it was originally dedicated.

The courts below, in granting judgment herein to defendants, did not determine, in the exercise of their discretion, whether defendants could be relied upon to carry out faithfully and effectively the purposes of the religious trust. The *Westminster* and *Watson* cases (*supra*), were cited and the conclusion drawn that St. Nicholas Cathedral must be occupied by an archbishop appointed by the central authorities in Moscow and that Benjamin, who was so appointed, was therefore entitled to the possession of the cathedral. This, we think, was error. The determinative issue in the case, apart from the action of the Legislature with respect to the problem, was whether there exists in Moscow at the present time a true central organization of the Russian Orthodox Church capable of functioning as the head of a free international religious body. If the Moscow patriarchal throne has been resurrected by the Soviet Government solely as a means of influencing opinion at home and abroad, and if it may now operate on an international scale, not as a true religious body, but only as an extension or implementation of Russian foreign policy, then it is clear that the North American metropolitan district and not the appointee or ambassador of the central authorities in Moscow, is the proper trustee to manage for the benefit of the faithful in this hemisphere those religious temporalities dedicated to the use of the Russian Orthodox Mission and Diocese prior to 1924 when it became an administratively autonomous metropolitan district. (Religious Corporations Law, § 105.)

We know that a nominal church organization exists in Russia, but that is not enough. We are told — by the *only* witness called by the defendants and one who supplied the *only* testimony to this effect — that " from 1925 to date, the Church has received greater liberty and is functioning freely as an Orthodox Church, without interference by the civil authorities, and the political views held by the authorities, *and any atheistic sentiment that they may have in no way interferes* with the unhampered activities of the Russian Orthodox Church." (Emphasis supplied.) On the other hand, plaintiff urges that, willingly or not, the Moscow patriarchy is unable to conduct " church-administrative activity " except as an arm of the Russian Government to

further its domestic and foreign policy; that that is a fact publicly recognized by our President and our State Department; and that it is attested to and demonstrated in the records submitted to us by (1) the imprisonment of Patriarch Tikhon, (2) the suppression of the patriarchal church during the days of the State-supported schism of the " Renovated Church " and (3) by the later re-establishment of an enfeebled patriarchate, when the " Renovated Church " had served its purpose, willing to pledge its loyalty to the Russian State and to attempt to exact a similar pledge from clergy abroad. Having in mind the warning of Lord COLERIDGE, in *Lumley* v. *Gye* (2 El. & Bl. 216, 267), " Judges are not necessarily to be ignorant in Court of what every one else, and they themselves out of Court, are familiar with ", we feel we must accept the historical statements contained in the dissenting opinion of Mr. Justice VAN VOORHIS, below: " * * * In recent public pronouncements the State Department, and our representatives in the United Nations, have frequently recognized and denounced the suppression of human rights and basic liberties in religion as well as in other aspects of life, existing in Soviet Russia and in all of its satellite states. The President of the United States has publicly characterized such efforts as a campaign to turn religion into a tool of the state (Armistice Day Address, November 11, 1949)." (276 App. Div. 309, 330.)

Everyone agrees that the Russian Orthodox Church has continuously existed down through the centuries, for no communicant would concede that the suppression of the church by the Soviet Government had ever destroyed the patriarchy as a *spiritual symbol* of the spiritual unity of the church as distinguished from its temporalities. Moreover, members of the North American metropolitan district admittedly revere and respect the *office* of the patriarchy, whatever may be their feelings as to the merits of the current incumbent of the office. This devotion is traditional and serves as a common bond for the members of the *Russian* Orthodox Church, as distinguished from the members of other Orthodox churches in various countries which have recognized as their spiritual heads at various times the Patriarchates of Constantinople, of Alexandria, of Antioch, of Serbia and of Jerusalem. Recognition of the Moscow patriarchy by the North American metropolitan district in

that sense is by no means a disavowal of the position steadfastly maintained by it down to the present day, viz., that the beloved patriarchy has been absorbed by the Russian Government and its action deprived, during the period of such domination, of any religious significance.

In short, we think that further inquiry might well have been made into the present status of the patriarchate in Russia and we think the Supreme Court should have determined, in the exercise of its discretion, whether Benjamin, the appointee of the central church authorities in Moscow, or Metropolitan Theophilus, the archbishop of the North American metropolitan district, was the proper person to administer the temporalities of St. Nicholas Cathedral and whether he was the proper trustee '' who may be relied upon to carry out more effectively and faithfully the purposes of this religious trust (*Carrier* v. *Carrier*, 226 N. Y. 114).'' (*Kedrovsky* v. *Russian Catholic Church*, 249 N. Y. 75, 77–78, *supra*.) That was not done because it was thought that the cases of *Watson* v. *Jones* (13 Wall. [U. S.] 679, *supra*), and *Trustees of Presbytery of N. Y.* v. *Westminster Presbyt. Church* (222 N. Y. 305, *supra*), required a decision in favor of defendants and that the earlier case of *Kedrovsky* v. *Rojdesvensky* (242 N. Y. 547, *supra*), was determinative of some phases of the problem. Our views on this aspect of the controversy would require reversal and the ordering of a new trial so that the Supreme Court might exercise its discretion along the lines herein indicated. It is unnecessary, however, to discuss that further, for there is another ground requiring reversal here and judgment in favor of plaintiff and the North American metropolitan district which it represents.

We refer, of course, to the authoritative and unambiguous action finally taken by the New York State Legislature in 1945 and 1948 with respect to the controversy which has now occupied the attention of our courts for a quarter of a century.

If there were any doubt as to the proper determination of the case along common-law lines, it has been completely eliminated by the Legislature. In April of 1945 (L. 1945, ch. 693), the Governor signed a bill adding a new article 5-C to the Religious Corporations Law consisting of four sections, two of which, sections 105 and 107, are presently material. In 1948 (L. 1948, ch. 711) important amendments were made to these sections

which will be noted later. In the first section (§ 105), the Legislature defined the " Russian Church in America " (i.e., the North American church as we have referred to it above) and carefully traced its origin. The first paragraph of section 105, as it reads today, is as follows: " The ' *Russian Church in America* ', as that term is used anywhere in this article, *refers to that group of churches, cathedrals,* chapels, congregations, societies, parishes, committees and other religious organizations of the Eastern Confession (Eastern Orthodox or Greek Catholic Church) *which were known as* (a) Russian American Mission of the Russian Orthodox Church from in or about 1793 to in or about 1870; (b) Diocese of Alaska and the Aleutian Islands of the Russian Orthodox Church from in or about 1870 to in or about 1904; (c) Diocese of North America and the Aleutian Islands (or Alaska) of the Russian Orthodox Church from in or about 1904 to in or about 1924; and (d) Russian Orthodox Greek Catholic Church of North America since in or about 1924; *and were subject* to the administrative jurisdiction of the Most Sacred Governing Synod *in Moscow* until in or about 1917, later the Patriarchate of Moscow, *but now constitute an administratively autonomous metropolitan district* created pursuant to resolutions adopted at a general convention (sobor) of said district held at Detroit, Michigan, on or about or between April 2nd to 4th, 1924." (Dates in Arabic; emphasis supplied.)

The second paragraph of section 105, defines what is meant in the statute by the phrase " Russian Orthodox church ". This is used as a word of art and is used generally to denote the particular local buildings or organizations of the Russian Orthodox faith as distinguished from the spiritual church. The statutory definition reads as follows: " A ' Russian Orthodox church ', as that term is used anywhere in this article, is a church, cathedral, chapel, congregation, society, parish, committee or other religious organization founded and established for the purpose and with the intent of adhering to, and being subject to the administrative jurisdiction of said mission [(a) above], diocese [(b) and (c) above], or autonomous metropolitan district [(d) above] hereinabove defined as the Russian Church in America." It is to be noted that the words " Russian Orthodox church " refer not only to those church buildings and religious

organizations founded and established for the purpose and with the intent of adhering to, and being subject to the autonomous North American metropolitan district *since 1924,* but also to those properties and organizations adhering and subject in the past to the Russian Mission from 1793 to 1870, and the North American Dioceses from 1870 to 1904 and from 1904 to 1924.

These definitions, in turn, make the meaning and intent of section 107 clear. With them in mind, the following command of the Legislature in section 107 is abundantly plain:

" 1. *Every Russian Orthodox church in this state, whether incorporated before or after the creation of said autonomous metropolitan district,* and whether incorporated or reincorporated pursuant to this article *or any other article of the religious corporations law,* or any general or private law, *shall recognize and be and remain subject to the jurisdiction and authority* of the general convention (sobor), metropolitan archbishop or other primate or hierarch, the council of bishops, the metropolitan council and other governing bodies and authorities *of the Russian Church in America,* pursuant to the statutes for the government thereof adopted at a general convention (sobor) held in the city of New York on or about or between October 5th to 8th, 1937, and any amendments thereto and any other statutes or rules heretofore or hereafter adopted by a general convention (sobor) of the Russian Church in America *and shall in all other respects conform to, maintain and follow the faith,* doctrine, ritual, communion, discipline, canon law, traditions and *usages of the Eastern Confession* (Eastern Orthodox or Greek Catholic Church).

" 2. * * *

" 3. *The trustees of every Russian Orthodox church shall have the custody and control of all temporalities and property,* real and personal, belonging to such church and of the revenues therefrom *and shall administer the same in accordance with the by-laws* of such church, the normal statutes for parishes of the *Russian Church in America* approved at a general convention (sobor) thereof held at Cleveland, Ohio, on or about or between November 20th to 23d, 1934, and any amendments thereto and all other rules, statutes, regulations and usages of the Russian Church in America." (Dates in Arabic; emphasis supplied.)

Little, if anything, is left for the courts to construe in the face of such a clear manifestation of intent. St. Nicholas Cathedral, the subject property herein, is indisputably a " Russian Orthodox church ", as defined in the statute. It was built in 1903 and dedicated as a cathedral in 1905, in connection with the establishment of the Diocese of North America and the Aleutian Islands, which as we have seen, is listed in the first paragraph of section 105. It is a " cathedral * * * founded and established for the purpose and with the intent of adhering to, and being subject to the administrative jurisdiction of said mission, *diocese* or autonomous metropolitan district hereinabove defined as the Russian Church in America." (Emphasis supplied.) As such, it is within the purview of subdivision 1 of section 107 and must be subject to the jurisdiction and authority of the governing bodies of the North American church. Likewise, pursuant to subdivision 3 of section 107, the trustees of the St. Nicholas Cathedral corporation must administer the cathedral in accordance with the by-laws, the normal statutes for parishes of the Russian Church in America as therein defined.

Special Term attempted to construe the statute, as it stood in 1945, in such a manner as to make it applicable *only* to those *new* parishes, founded and established *after 1924* for the express purpose of adhering to the Russian Church in America. Whether the court's construction was justified under the then wording of the statute is not before us, for after the decision at Special Term, and obviously as a result of it, the Legislature amended the statute to read in its present form, above quoted. In order that there might not be any doubt that the 1945 legislation was intended to apply to a property, such as St. Nicholas Cathedral, the second paragraph of section 105, defining " Russian Orthodox church ", was amended so that there was included within its compass any cathedral " founded and established for the purpose and with the intent of adhering to, and being subject to the *administrative* jurisdiction of *said mission, diocese or autonomous metropolitan district hereinabove defined as* the Russian Church in America." (New matter italics.) Likewise, subdivision 1 of section 107, which provides that every such Russian Orthodox church in this State shall " recognize and be and remain subject to the jurisdiction and authority " of the Russian Church in America, was amended to provide that

such Russian Orthodox churches were within its coverage " whether incorporated *before or after the creation* [1924] *of said autonomous metropolitan district* ". (New matter italics.) These significant amendments, enacted within a month after Special Term's decision, illustrate beyond cavil that the decision of that court did not correspond with the intent of the Legislature, which immediately interpreted and explained its prior enactment.

Nevertheless, the majority in the Appellate Division, while conceding that plaintiff was entitled to the benefit of the statute in its amended form, failed properly to appreciate and give meaning to what we consider to be the plain legislative intent. It said in part (p. 317) : " In other words, it appears to us that it [§ 107] was intended to mean that any church *heretofore or hereafter* incorporated for the purpose of adhering to the American church must be subordinate to the rules and the decisions of the authorities of the governing bodies of that church [the American church, the autonomous metropolitan district, created in 1924]." Such a view gives no meaning to the change made by subdivision 1 of section 107 by the 1948 amendment. That amendment excised the three words (" heretofore or hereafter ") which we have italicized in the above quotation, and substituted the words: " before or after the creation of said autonomous metropolitan district [in 1924] * * *." The following quotation from subdivision 1 of section 107 shows in brackets the words eliminated by the 1948 amendment and indicates by italicizing the words substituted by that amendment: " Every Russian Orthodox church in this state, whether [heretofore or hereafter] incorporated *before or after the creation of said autonomous metropolitan district* * * * shall recognize and be and remain subject to the jurisdiction and authority of * * * the Russian Church in America * * *." The Legislature quite clearly made the amendment after the decision at Special Term herein so as to remove the possibility of a construction such as that adopted by the Special Term and later the Appellate Division, that the statute was limited in its operation to churches incorporated after 1924. If, as the Appellate Division construed it, the statute were limited to churches " incorporated for the purpose of adhering to the American

church '', that would mean that it could only apply to churches founded and established after 1924, since that was the year in which the autonomous metropolitan district, denominated by the Appellate Division, the American church, was created. Yet subdivision 1 of section 107 clearly states that it is to apply to Russian Orthodox churches '' whether incorporated *before or after* the creation of said autonomous metropolitan district '', i. e., before or after 1924. The only construction which gives meaning to all the language in sections 105 and 107 is that the statute was intended to apply. to those Russian Orthodox churches founded and established before 1924 for the purpose of adhering and being subject to the North American Mission or North American Diocese, and to those Russian Orthodox churches founded and established after 1924 for the purpose of adhering and being subject to the autonomous metropolitan district. The majority in the Appellate Division further intimated that to read the statute literally would result in an interference in ecclesiastical concerns not within the competency of the Legislature. The latter suggestion is the only one which requires discussion, for, as already indicated, the intent of the Legislature (as distinguished from its competency) is unmistakable.

The primary purpose of the Religious Corporations Law is to provide for an orderly method for the administration of the property and temporalities dedicated to the use of religious groups and to preserve them from exploitation by those who might divert them from the true beneficiaries of the trust. Prior to 1875, when the Legislature provided for denominational control of the temporalities of religious corporations, the majority of the members of a religious corporation could change its denominational character and devote the church property to an entirely different religious faith than that for which it was originally dedicated. (*Robertson* v. *Bullions*, 11 N. Y. 243, 263–264; *Petty* v. *Tooker*, 21 N. Y. 267; *Gram* v. *Evangelical Lutheran Soc.*, 36 N. Y. 161.) For the public good, the Legislature decreed that the trustees of religious corporations, irrespective of the wishes of the majority of the local congregation, must administer the temporalities in accordance with the discipline, rules and usages of the ecclesiastical body, if any, to

which the corporation was subject. (Religious Corporations Law, § 5.) As a broad guide this rule undoubtedly has worked well, but it is by no means a constitutional doctrine not subject to change or modification by the same Legislature which announced it, in cases where literal enforcement would be unreasonable and opposed to the public interest. The Legislature, in the exercise of its extensive and acknowledged power to act for the common welfare, may find as a fact that a situation has arisen of such novelty and uniqueness that existing law is incapable of performing its avowed function — the preservation of religious temporalities for the use of their original and accustomed beneficiaries. If the Legislature find as a fact that, because of drastically changed circumstances, the accustomed beneficiaries of religious properties are thus threatened with their loss, and if there be a basis for such finding, we perceive no constitutional objection to a legislative attempt to trace and identify, as of today, the authentic group entitled to the administration of such properties.

That, as we see it, is all that the Legislature has done in the above-quoted provisions of article 5-C. The Legislature has made a determination that the '' Russian Church in America '' was the one which, to use our words in 249 New York at pages 77–78, was the trustee which '' may be relied upon to carry out more effectively and faithfully the purposes of this religious trust (*Carrier* v. *Carrier*, 226 N. Y. 114)'' by reason of the changed situation of the patriarchate in Russia. No purpose would be served by repeating all the circumstances which forced the North American church to declare its temporary autonomy, and the process by which the Moscow Patriarchy has been subjugated by the Russian Government and used as its tool. All that has been detailed fully above. These facts must be deemed to have been found by and to have been within the actual knowledge of the Legislature when it decided to act in 1945 and 1948. Even assuming that we, as judges, are prevented from recognizing these facts, it cannot be successfully contended that the Legislature is required to labor under such unrealistic handicap.

The Legislature of the State of New York, like the Congress of the United States, in addition to the general knowledge of its members, has access to vast sources of information to assist it

in determining the need and scope of new statutory law. Every new piece of legislation is the result of certain factual premises, whether they be expressed or tacit. In gathering the material for these premises, and in evaluating conflicting data, the Legislature is not bound by any formal rules. It has the widest latitude of inquiry. It cannot, and does not, close its eyes to any legitimate avenue of knowledge.

The courts have always recognized that it is the province of the Legislature to make the underlying findings of fact which give meaning and substance to its ultimate directives. The courts have traditionally refused to consider the wisdom or technical validity of such findings of fact, if there be some reasonable basis upon which they may rest.

Thus, in passing upon matters of legislative intent and competence, the courts do not merely read the bare end product of the legislative labors. They read the statute in the light of the state of facts which were found by the Legislature, and which prompted the enactment. Then, and only then, can the courts intelligently approach their assigned tasks.

A recent pertinent example of such judicial recognition of the extent of the power of the legislative body to find the facts in a situation involving communist activity is found in *American Communications Assn.* v. *Douds* (339 U. S. 382). There, the noncommunist oath provision in the National Labor Relations Act was upheld, not because any such oath requirement was generally within the power of Congress, but because the specific evil, *the existence of which Congress was assumed to have reasonably found as a fact,* was such that some infringement upon traditional liberties was justifiable. The case illustrates well that enactments which might seem unconstitutional on their face may yet be sustained if the factual background found by the legislative body warranted an extended exercise of its powers. The case is noteworthy, too, in that it rejects the fallacious contention that the legislative body cannot go behind a carefully constructed facade to ascertain the real motives, ends and techniques of communist activity. It recognizes, as we must recognize in the instant case, that problems created by the extension of Soviet communist activity in this country are *sui generis,* and can only be dealt with intelligently on that basis.

As Justice JACKSON said in his opinion (p. 423, n. 1): " Of course, it is not for any member of this Court to express or to act upon any opinion he may have as to the wisdom, effectiveness or need for this legislation. Our ' inquiries, where the legislative judgment is drawn in question, must be restricted to the issue *whether any state of facts either known or which could reasonably be assumed affords support for it.'* *United States* v. *Carolene Products Co.*, 304 U. S. 144, 154.'' (Emphasis supplied.) (See, also, *Powell* v. *Pennsylvania,* 127 U. S. 678, 685; *O'Gorman & Young* v. *Hartford Fire Ins. Co.*, 282 U. S. 251, 257–258; *Szold* v. *Outlet Embroidery Supply Co.*, 274 N. Y. 271, 278.)

The judicial technique of ascertaining the legislative finding of fact supporting a particular enactment is shown in Justice JACKSON's opinion in the *Douds* case (*supra,* pp. 424–433). He wrote (p. 424):

'' From information before its several Committees and from facts of general knowledge, Congress could rationally conclude that, behind its political party facade, the Communist Party is a conspiratorial and revolutionary junta, organized to reach ends and to use methods which are incompatible with our constitutional system. A rough and compressed grouping of this data would permit Congress to draw these important conclusions as to its distinguishing characteristics.'' (Then follows a footnote containing a long list of books and articles.) * * *

'' It rejects the entire religious and cultural heritage of Western civilization, as well as the American economic and political systems. This Communist movement is a belated counter-revolution to the American Revolution, designed to undo the Declaration of Independence, the Constitution, and our Bill of Rights * * * '' (p. 425).

The Legislature of the State of New York, like the Congress, must be deemed to have investigated the whole problem carefully before it acted. The Legislature knew that the central authorities of the Russian Orthodox Church in Russia had been suppressed after the 1917 revolution, and that the patriarchate was later resurrected by the Russian Government. The Legislature, like Congress, knew the character and method of operation of international communism and the Soviet attitude toward

things religious. The Legislature was aware of the contemporary views of qualified observers who have visited Russia and who have had an opportunity to observe the present status of the patriarchate in the Soviet system.[7] The Legislature realized that the North American church, in order to be free of Soviet interference in its affairs, had declared its temporary administrative autonomy in 1924, pursuant to the ukase of 1920, while retaining full *spiritual* communion with the patriarchate, and that there was a real danger that those properties and temporalities long enjoyed and used by the Russian Orthodox Church worshippers in this State would be taken from them by the representatives of the patriarchate. On the basis of these facts, and the facts stated (*supra*) and no doubt other facts we know not of, our Legislature concluded that the Moscow Patriarchate was no longer capable of functioning as a true religious body, but had become a tool of the Soviet Government primarily designed to implement its foreign policy. Whether we, as judges, would have reached the same conclusion is immaterial. It is sufficient that the Legislature reached it, after full consideration of all the facts.

It is clear, therefore, that the plaintiff corporation and the autonomous metropolitan district which it represents, must prevail in this action in accordance with the legislative finding and mandate and be reinvested with the possession and administration of the temporalities of St. Nicholas Cathedral.

The judgments below should be reversed, with costs in all courts, and judgment directed for the plaintiff.

FROESSEL, J. (concurring). As I view this controversy, we have the rather unusual situation of a foreign government, which all of us agree is grossly antireligious, assuming domination and control over the Russian Orthodox Church; leaving that

---

[7] Our former Ambassador to Russia wrote: " The new tolerance for the Orthodox Church can be seen, therefore, as severely limited and primarily designed to serve as an instrumentality of an expansive foreign policy." (Walter Bedell Smith, My Three Years in Moscow, p. 268.) See, also, Anne O'Hare McCormick in the *New York Times*, April 8, 1950 (p. 12) : " The church has again an official place in the Soviet Union, but as an agency of the state; on the same terms the religious leaders being imprisoned and executed as ' traitors ' in the countries under Soviet control would be tolerated. When Caesar is also God there can be no divided tribute."

church fettered, helpless and restrained of its freedom. Any other view, it seems to me, is to ignore stark reality. Under that domination, which is nothing less than plain duress, it seeks to reach out to the United States to assume control of church property within this State, title to which is held by plaintiff, a New York State corporation, and which property has been dedicated to the use of members of a parish and of a diocese.

The evidence in the records before us, and as outlined in the prevailing opinion, buttressed by facts of historical knowledge of which we may take judicial notice (*Nankivel* v. *Omsk All Russian Govt.*, 237 N. Y. 150, 156), and as found by the Legislature of this State (*East New York Sav. Bank* v. *Hahn*, 293 N. Y. 622), leads inescapably to the conclusion that plaintiff is entitled to judgment.

Judge CONWAY has sufficiently outlined in detail the history of the Russian Orthodox Church, so far as pertinent here. We are all in accord that the election of Patriarch Tikhon at the sobor of 1917–18, following the Kerensky revolution, had indisputable validity, and that Archbishop Evdokim was the duly appointed diocesan archbishop for North America in 1917, before he returned to Russia. It was he who held title to the property in suit for a short time (1916–17), and then voluntarily reconveyed it to plaintiff's corporate predecessor. After Kerensky was overthrown and the Bolsheviks came into power, the patriarchal chain of succession was broken. The prevailing opinion outlines briefly what happened to the Russian Orthodox Church in Russia. When Patriarch Tikhon, the last duly elected Patriarch, was imprisoned, he issued his famous ukase to the Russian Orthodox Church abroad. In 1923, with the concurrence of the Sacred Synod, he designated Platon as ruling bishop of the North American church, who continued until his death in 1934, following his active participation in and approval of the American sobors, commencing in 1922, which invoked the ukase of 1920.

The first sobor of the Russian Orthodox Church held since Tikhon was elected Patriarch was the pseudo-sobor of 1923, at which no Patriarch was elected, and which is now conceded to have been uncanonical. The only other sobor held since was the one at Moscow in 1945, when the American delegates, two clergy-

men, were met by a Russian airplane, but deposited in Siberia instead of Moscow in the month of January, rendering it impossible for them to complete their journey by train until ten days after the sobor had adjourned, thus denying them representation though duly invited.

We do not have here any such situation as was presented in *Watson* v. *Jones* (13 Wall. [U. S.] 679) where the highest church body was concededly free. Here, the Russian Orthodox Church, as presently constituted and dominated, is not free, its administrative agency is not the true body of the church, and is compelled to demand loyalty to the Soviet Government from all the priests of the Russian church abroad.

By our decision, we are not intruding unlawfully into the internal affairs of a religious body, but rather refusing to sanction such intrusion by an atheistic foreign government, so far as it affects property within our jurisdiction. Plaintiff-appellant holds title to the property in suit, in trust, not for the Russian Orthodox Church, but rather for the use of the membership for whom it was dedicated, and, so long as it administers the property for the faithful of the church within the diocese, it is entitled to possession and control. (*Westminster Presbyt. Church* v. *Trustees of Presbytery of N. Y.*, 211 N. Y. 214.) As we there said (pp. 225–226), where the ecclesiastical governing body's freedom of action was unquestioned, '' The error which, as it seems to me, pervades the disposition made of this case in the courts below, is the idea that the Presbytery could take away from the Westminster Presbyterian Church of West Twenty-third Street all authority and control of its trustees over its real property, and by hostile action appropriate that property to such uses as it saw fit without any legal proceeding to that end, and wholly by the exercise of the ecclesiastical jurisdiction of the Presbytery.'' How much more so does this reasoning apply to the instant situation.

I concur in Judge CONWAY's opinion.

DESMOND, J. (dissenting). None of us, of course, deny that the present Russian Government is frankly and grossly anti-religious and irreligious. But judicial recognition of that well-known fact is of no help in deciding this lawsuit. We are dissenting here because we strongly feel that this decision is an

unlawful intrusion into the internal affairs of a religious body, contrary to first principles of American government, violative of the First Amendment's guaranty of freedom of religions from such governmental interference, and in conflict with the controlling decisional law as set forth in *Watson* v. *Jones* (13 Wall. [U. S.] 679) and *Westminster Presbyt. Church* v. *Trustees of Presbytery of N. Y.* (211 N. Y. 214). For the decision about to be made is just this: that the judicial and legislative branches of the Government of this State have the power (and that the New York State Legislature has exercised the power) to oust from the archdiocesan cathedral of the Russian Orthodox Church in New York City, a prelate (defendant Benjamin) who has been appointed archbishop of that archdiocese by the Patriarch of Moscow, supreme head of that church. No other decision reaching such a result can be found in the books.

In aid of clarity we set down these indisputable and uncontested propositions:

1. The Russian Orthodox Church is a " general " or centrally organized church (see *Watson* v. *Jones, supra,* p. 722), under whose law and discipline the Patriarch of Moscow, as its supreme head, has the power of appointing archbishops.

2. Defendant Benjamin was appointed by the Patriarch as archbishop of the Diocese of North America and the Aleutian Islands, and that appointment is now in effect.

3. The Russian Orthodox Cathedral in New York City, is the see church of the archdiocese, and, accordingly, defendant Benjamin, as the duly appointed archbishop, is entitled to possess and occupy that cathedral as his see church.

4. Plaintiff-appellant, a New York corporation, holds title to the cathedral property but, under New York law, that title is in trust for the religious purposes of the Russian Orthodox Church, and for no other purpose (*Westminster Presbyt. Church* v. *Trustees of Presbytery of N. Y.,* 211 N. Y. 214, 223, *supra*).

5. Plaintiff, in seeking to exclude defendant Archbishop Benjamin from possession of the cathedral, is acting under the control of, and in the interest of, a dissident or schismatic group of Russian Orthodox Catholic individuals and parishes, which group, formed at Detroit in 1924, refuses to recognize the authority and primacy of the Patriarch of Moscow.

6. Under the law of New York (see Religious Corporations Law, § 5), religious denominations, such as the world-wide Russian Orthodox Church, have denominational control over their constituent churches, parishes or branches, and the constituents cannot escape such control by secession (*Trustees of Presbytery of N. Y.* v. *Westminster Presbyt. Church,* 222 N. Y. 305, 315).

7. The appointment of Archbishop Benjamin, as an official act of the highest Russian Orthodox Church authority, was a decision on a denominational matter of internal church government, and as such is final, and absolutely binding on the civil courts of this State (*Watson* v. *Jones,* 13 Wall. [U. S.] 679, 727, 729, *supra*).

The sum of those plain propositions is this: that Archbishop Benjamin's possession of the cathedral is not subject to control by any civil authority or by any judgment of a civil court, and that no civil court may decree to the independent or nonconformist group (which controls plaintiff corporation), possession of that cathedral, hostile to the authority and action of the mother church (*Watson* v. *Jones, supra,* p. 734).

What bases, then, are announced for the direction by this court that a judgment issue which will remove defendant Benjamin from his cathedral? As we understand it, those asserted grounds are two: first, that the Moscow Patriarchate is not in fact functioning as the true central organization of the Russian church but is a mere agency or instrumentality of the Soviet regime; and, second, that article 5-C of the New York Religious Corporations Law has, by legislative fiat, ousted the patriarchal appointee, and turned the cathedral over to the schismatics. The first of those bases amounts to a new finding by this court, without evidentiary support in this record, and in the face of contrary testimony, and express contrary findings by both courts below. The second basis gives to article 5-C a construction not reasonably supported by its language, or by its history, or by any reasonable or discoverable legislative intent — a construction which, furthermore, makes the statute unconstitutional. We now take up these matters in turn.

The finding, or determination, now being made by the majority of this court as a basis for reversal, is that the presently ruling Patriarch of Moscow is not, and should not, be treated as, the true central head of the church, but that he is a mere fellow

traveler on the communist road, serving not God but the Soviet Caesar. Interestingly enough, plaintiff itself seems not to cast so cold an eye on the Patriarch, since the record abounds with protestations by the " American ", or schismatic Orthodox Russians, of their filial loyalty and devotion to the Patriarch, whom they regard as a virtuous and venerable spiritual leader. Aside from that, and confining ourselves within the strict bounds of our own jurisdiction we, the Court of Appeals, have, of course, no power or right to adjudicate that the incumbent is no true Patriarch but a mere usurper or pretender. We dissenters refuse so to do, not from any mere naïveté as to Russia and communism, but as a necessary conclusion from the record in this lawsuit. At the very most, we have here the attempted determination of a fact, vigorously denied by witnesses, and found to the contrary by the courts which have jurisdiction to pass on facts.

It is suggested that common sense, or general knowledge, makes it appropriate for us to take judicial notice that Patriarch Alexy is not acting independently but is obeying commands of his communist masters. Perhaps he is, for all we know, but his motivation is no proper subject of judicial notice. Many years ago our predecessors warned us against taking judicial notice in such uncertain fields (see *Baxter* v. *McDonnell,* 155 N. Y. 83, 93). And, even if we could, somehow or other, get sure knowledge that the Patriarch's appointment of this archbishop was made for the most unholy reasons, or because of the meanest accommodation to brute power, we still could not, as a court, strike down the appointment or refuse to give it credit. The Patriarch, like all men, must account for his stewardship, but not to the New York courts.

The long and the short of it is that this is an ecclesiastical matter, to which, be their answer right or wrong, the ecclesiastic superiors have the final answer. " * * * and civil courts, if they should be so unwise as to attempt to supervise their judgments on matters which come within their jurisdiction, would only involve themselves in a sea of uncertainty and doubt, which would do anything but improve either religion or good morals " (*Connitt* v. *Reformed Prot. Dutch Church of New Prospect,* 54 N. Y. 551, 562). We are not talking about the powers of courts or of government to keep from our shores

persons dangerous to our institutions, be they churchmen or laymen, or to deal with such persons when and if they violate our laws. No one has testified that Archbishop Benjamin is such a subversive, and, if he were, the New York courts would hardly be the place, or an action of ejectment the method, to arrange for his deportation from our shores. The United States Government has never withdrawn recognition of the Russian Orthodox Church and its Patriarch (see *Ponce* v. *Roman Catholic Church,* 210 U. S. 296, 318).

We turn now to the statute which seems to be appellant's chief reliance. Article 5-C of the Religious Corporations Law, consisting of four sections (§§ 105–108), was enacted in 1945 (L. 1945, ch. 693) and amended in 1948 (L. 1948, ch. 711). Its language follows the general pattern of several other articles in the same law. On its face there is no indication that it had any purpose other than that of any other special or general law incorporating a religious society or sect or church, that is, " to give an organization for public worship legal rights, and to impose on it legal obligations as a corporate body " (*Van Buren* v. *Reformed Church of Gansevoort,* 62 Barb. 495, 497; *Petty* v. *Tooker,* 21 N. Y. 267, 271). Incorporation of a church is the method by which the municipal law recognizes a church's present existence. Obviously, such a statute cannot be a device for transferring property from one faction to another, or for subjecting centrally organized churches to the control of seceding groups. Neither of those two general statements will be contradicted, and yet we are told that the passage by the New York Legislature, in 1945, of article 5-C, and its amendment in 1948, had the precise and intended effect of freeing the whole Russian Orthodox religious community in America from its traditional submission to its supreme hierarchical head, of outlawing in New York so much of that community as remained submissive to the Patriarch, of putting the whole group and all its properties under the control of the new schismatic " Russian Church in America ", and, specifically, of mandating the ouster of the patriarchically appointed archbishop and the substitution of a rival claimant, not so appointed. We confidently assert that there is nothing in the statute itself to suggest such a legislative coup, that there is much to show that such was not the legisla-

tive purpose, and that the statute, if so intended or so construed, is plainly unconstitutional.

The first section (105) in article 5-C is headed '' Definitions ''. It is not in form or in meaning a preamble or legislative finding of fact. It defines two terms used elsewhere in the article: '' Russian Church in America '' and '' Russian Orthodox church ''. The long, one-sentence definition of the first of those terms says that, as used in the article, it means those churches, cathedrals, parishes, etc., which were known as the Russian American Mission of the Russian Orthodox Church from 1793 to 1870, then known as the Diocese of Alaska, etc., from 1870 to 1904, then as the Diocese of North America and the Aleutian Islands from 1904 to 1924, and which have been known as the Russian Orthodox Greek Church of North America since 1924, and which were subject to the administrative jurisdiction of the Most Sacred Governing Synod in Moscow until 1917, later the ''Patriarchate of Moscow '', but which '' now constitute an administratively autonomous metropolitan district created pursuant to resolutions adopted at a general convention (sobor) of said district held at Detroit, Michigan, on or about or between April second to fourth, nineteen hundred twenty-four.'' A '' definition '' of a term is a precise statement of its meaning. Nothing could be more precise than the statement (above summarized) which the Legislature thus gave us of what the Legislature meant by the use, in article 5-C, of the term '' Russian Church in America ''. The definition describes, by reciting its history, the particular '' group '' of churches intended to be affected by the article. So read, the definition cannot possibly mean anything but this: that the '' group '' of churches or parishes thus recognized by the Legislature under the name '' Russian Church in America '', were those particular churches and parishes which were formerly part of the unified body called at successive times first the '' Russian American Mission '', then called the '' Diocese of Alaska and the Aleutian Islands '', then styled the '' Diocese of North America and the Aleutian Islands '' and which have been called the '' Russian Orthodox Greek Catholic Church of North America '' since 1924 — in other words, the secessionists. To make that totally clear, the Legislature added to its '' definition '' a statement that it meant those churches, cathedrals or parishes which, though

formerly subject to the Moscow Patriarch, had created themselves into an autonomous metropolitan district (or diocese) in April, 1924. On the trial, the witnesses agreed that not all the American parishes of the Russian Orthodox Church have gone over to the new " American " church. The definition describes those who did so cross over. The second " definition " in section 105 (of " Russian Orthodox church ") says that term means a church, cathedral, etc., founded and established with the purpose and intent of adhering to the new metropolitan district.

The next section (106) of article 5-C sets forth the formalities for incorporation of a " Russian Orthodox church ", as defined in section 105. Section 107, as amended in 1948, prescribes the method of government, by the new " Russian Church in America " of " every Russian Orthodox church in this state ", whether incorporated before or after the creation of the new " autonomous metropolitan district ". Appellant seizes upon the words " every Russian Orthodox church in this state " as meaning, literally, every Russian Orthodox parish, church or cathedral, whether or not it has seceded, and whether or not it desires to retain its traditional ties with the Patriarch. Of course, the words must be limited as defined in section 105, which says precisely what they are to mean, when " used anywhere in this article ".

Section 108, headed " Reincorporation of existing corporations " authorizes the reincorporation " under the provisions of this article ", of any " heretofore incorporated Russian Orthodox church ". Such a provision would be useless and meaningless if the Legislature had, by the previous sections of the article, put every Russian Orthodox church and parish, automatically, into the new, dissident, " Russian Church in America ". Indeed, if so strange and ruthless a plan had been intended by the Legislature, section 105 itself (" Definitions ") would have been meaningless and unnecessary since, with all included, there would be no need for any definition or limitation.

Article 5-C, we think, is so plain and clear as not to need or permit any construction beyond the patent meaning of its simple words (*Matter of Rathscheck*, 300 N. Y. 346, 350). But if construction were permissible, every known canon of construc-

tion would lead to the same result: that the Legislature could not have intended this as a statute of outlawry, ouster, or disestablishment. Words in a statute are to receive their natural and obvious meaning; the general purpose and spirit of the law is to be kept in mind; objectionable consequences, injustice and unreasonableness are to be avoided; acts will not be so construed as to accuse the Legislature of a purpose to do harm (see McKinney's Cons. Laws of N. Y., Book 1, Statutes [1942 ed.], §§ 94, 96, 141, 143, 146, 148, 151, and cases cited for these propositions). A bad result suggests a wrong construction (*People ex rel. Beaman* v. *Feitner*, 168 N. Y. 360, 366). We find another aid to construction in the very practical idea that the busy New York Legislature which enacted over 1,200 laws in 1945, and which had no committee reports or debates as to article 5-C, was entitled to believe that this law meant what it said, without hidden purposes.

And one of the most urgent of all the canons of construction is this one: that a statute must be construed, when possible, " in manner which would remove doubt of its constitutionality, and possible danger that it might be used to restrain or burden freedom of worship or freedom of speech and press " (*People* v. *Barber*, 289 N. Y. 378, 385). Put another way, the rule is that the construction, if at all possible, must be such as not only to avoid unconstitutionality but to avoid grave doubts thereof (*Matter of Cooper*, 22 N. Y. 67, 87, 88; *Kovacs* v. *Cooper*, 336 U. S. 77, 85; *Tauza* v. *Susquehanna Coal Co.*, 220 N. Y. 259, 267; *People* v. *Realmato*, 294 N. Y. 45, 50; *United States* v. *Jin Fuey Moy*, 241 U. S. 394, 401). How can there be any dispute but that this article 5-C, if read so as to take this archbishopric from the control of the central church and give it to appellant's group, is unconstitutional? *Watson* v. *Jones* (*supra*), does not use the precise word " unconstitutional " but the opinion, contrasting American with old world systems (see p. 728 *et seq.* of 13 Wall. [U. S.]), says that " In this country the full and free right to entertain any religious belief, to practice any religious principle " finds expression in the American rule of law that the determinations of the tribunals and judicatories of a centrally organized church are absolutely binding on the civil power. The modern Supreme Court in *Everson* v. *Board of Educ.* (330 U. S. 1, 13), has cited *Watson* v. *Jones* (*supra*), as authority for the proposition that

the First Amendment provides "protection against governmental intrusion on religious liberty" through statutes. It is no answer to this charge of unconstitutionality that there is here in dispute a "property right" only as to the use of a building. "* * * when rights of property are dependent upon the questions of doctrine, discipline or church government, the civil court will treat the determination made in the highest tribunal within the church as controlling" (*Baxter* v. *McDonnell*, 155 N. Y. 83, 101, *supra*, citing *Watson* v. *Jones, supra*; and *Connitt* v. *Reformed Prot. Dutch Church of New Prospect, supra*; see *Gonzalez* v. *Archbishop of Manila*, 280 U. S. 1, 16).

We pause to remark on the notable similarity between the present case and *Watson* v. *Jones* (*supra*). A controversy over slavery split the Presbyterian Church in Kentucky in the 1860's; dissension over communism ideologies and Soviet controls played their part in the internecine warfare which broke out among the American members of the Russian Orthodox Church. A faction withdrew from the central control in the Presbyterian Church; plaintiff's faction here divorced themselves from their supreme hierarch. In *Watson* v. *Jones,* the Supreme Court, holding the Presbyterian controversy to be "a case of division or schism in a church" (p. 717), as is surely true of our case, made the classic statement of law which runs from page 722 to the end of the long opinion. The holding as between the dissenters and the central organization was summarized thus: "They [the schismatics] now deny its authority, denounce its action, and refuse to abide by its judgments. They have first erected themselves into a new organization, and have since joined themselves to another totally different, if not hostile, to the one to which they belonged when the difficulty first began. Under any of the decisions which we have examined, the appellants, in their present position, have no right to the property, or to the use of it, which is the subject of this suit" (p. 734).

Going back to the statute (art. 5-C) and its supposed effect here, we have, fortunately, the strongest kind of proof from the Religious Corporations Law itself that the Legislature never intended for article 5-C the meaning and result now ascribed to it. In 1943 (ch. 145 of that year) the Legislature, two years before it set up article 5-C, had enacted a new article XV of the

Religious Corporations Law and had, concurrently, amended subdivision 3 of section 15 of the Religious Corporations Law. That 1943 legislation described and recognized a "federation" of the "four primary Orthodox Greek Catholic jurisdictions in America", being the churches, congregations, etc., recognized by the "apostolic historic Orthodox Patriarchates of Constantinople, Antioch, Moscow and Serbia (Jugoslavia)". Among other things, that 1943 law described the processes whereby new congregations adhering to the four historic patriarchates could be newly incorporated or reincorporated as member churches of the federation. The significance for us is this: as late as 1943, the Legislature was thus legislating as to those churches which were under the government of the Moscow Patriarch. The Governor of New York, after signing the bill, made it clear that he so understood its import. In a speech at Buffalo (see Public Papers of the Governor, 1943, p. 550) Governor Dewey said: "For more than 180 years members of the Greek Church have been on what is now American soil. We find in the records that as long ago as 1763 a native of the Aleutian Islands was converted by a devout and hardy missionary from Russia. Nineteen years later the Holy Synod sent a mission of eight monks to Alaska and in 1794 they established missionary headquarters on the Kodiak Island. Three years later the hierarchy of the Greek Church consecrated a Bishop of Alaska, but he perished at sea before he could ever reach his diocese. The living successor of the reverend prelates who succeeded him is The Most Reverend Metropolitan Benjamin of New York. It is an interesting historic fact, particularly in these days, that his full title is Metropolitan of the Archdiocese of the Aleutian Islands and North America."

The Most Reverend Metropolitan Benjamin whom the Governor thus saluted as the successor to the historic line of Orthodox prelates in America was our defendant Benjamin.

Thus we see that in 1943, by article XV and the amendment to section 15, the Legislature dealt with those Orthodox churches which remained loyal to the Patriarch and in 1945 and 1948, through article 5-C, gave its attention and recognition to the new, nonconformist "American Church". There is no slightest sign that the Legislature intended the later statutes to repeal the earlier. We should not strain to discover a repeal by implication

but must read these statutes as harmonious parts of a whole and assume that the Legislature in 1945 knew what it had done in 1943 (*Matter of Cooper,* 22 N. Y. 67, 88, *supra; Chase* v. *Lord,* 77 N. Y. 1, 18; *Matter of Tiffany,* 179 N. Y. 455, 457; *Matter of Timmis,* 200 N. Y. 177, 181; *Betz* v. *Horr,* 276 N. Y. 83, 88; *Morris Plan Ind. Bank of N. Y.* v. *Gunning,* 295 N. Y. 324, 331). " The intent and purpose of the legislative commands must be found from the statutes relating to the same general subject-matter taken as a whole " (*Betz* v. *Horr, supra,* p. 88). " If by any fair construction, whether strict or liberal, a reasonable field of operation can be found for both acts, that construction should be adopted. In other words, if the old and the new law, by any reasonable interpretation, can stand together, there is no repeal by implication " (*Matter of Tiffany, supra,* p. 457). The Legislature in 1943 dealt with the patriarchal church, in 1945 with the American church, and there is no repugnance, inconsistency or overlapping of the two sets of statutes.

A final comment:

In the long run, communist repression and abuse of religion will make religion stronger, for " the blood of the martyrs is the seed of the Church ". And so with government interferences with churches in our country. But with us the loser will be a traditional principle of American government: that the inner affairs of religious bodies are no concern of the State.

The judgment should be affirmed, with costs.

LEWIS, DYE and FROESSEL, JJ., concur in opinion by CONWAY, J.; LEWIS, CONWAY and DYE, JJ., concur in separate opinion by FROESSEL, J.; DESMOND, J., dissents in opinion in which LOUGHRAN, Ch. J., and FULD, J., concur.

Judgments reversed, etc. [See 302 N. Y. 689.]