In the Matter of the Accounting of ELISABETH S. RATHSCHECK, as Administratrix of the Estate of EDGAR R. RATHSCHECK, Deceased. J. HOWARD McGRATH, Attorney General of the United States, as Successor to the Alien Property Custodian, Appellant. ELISABETH S. RATHSCHECK, Respondent.

Argued January 12, 1950; decided March 2, 1950.

*Ralph S. Spritzer* and *James L. Morrisson, Attorneys, Department of Justice, Irving H. Saypol, United States Attorney for the Southern District of New York,* and *Harold I. Baynton, Acting Director, Office of Alien Property,* for appellant. I. The Mexican divorce decree was invalid under New York law. (*Stevens* v. *Stevens,* 273 N. Y. 157; *Williams* v. *North Carolina,* 325 U. S. 226; *Caldwell* v. *Caldwell,* 298 N. Y. 146; *Querze* v. *Querze,* 290 N. Y. 13; *Vose* v. *Vose,* 280 N. Y. 779.) II. Having procured the invalid Mexican decree, respondent is barred, by express provision of statute, from sharing in decedent's estate. (Decedent Estate Law, § 87, subd. [b].) III. For purposes of subdivision (b) of section 87, no valid distinction can be drawn between the procurement of a " mail-order " divorce decree and

the procurement of any other type of invalid divorce decree. (*Caldwell* v. *Caldwell,* 298 N. Y. 146; *Querze* v. *Querze,* 290 N. Y. 13; *Vose* v. *Vose,* 280 N. Y. 779; *Senor* v. *Senor,* 272 App. Div. 306; *Starbuck* v. *Starbuck,* 173 N. Y. 503; *Monroe Co. Sav. Bank* v. *Yeoman,* 119 Misc. 226; *Matter of Adams,* 182 Misc. 937, 267 App. Div. 985, 268 App. Div. 849, 324 U. S. 865.)

*Homer I. Harris* for respondent. I. Appellant's brief is predicated upon the fallacious theory that there is no distinction between a Mexican "mail-order" divorce and a divorce obtained in a foreign State or country where there is a semblance of jurisdiction. (*Caldwell* v. *Caldwell,* 298 N. Y. 146; *Matter of Moore,* 165 Misc. 683, 254 App. Div. 856, 255 App Div. 774, 280 N. Y. 733; *Matter of Goldsmith,* 174 Misc. 270; *Matter of Blumenstiel,* 248 App. Div. 533; *Close* v. *Farmers Loan & Trust Co.,* 195 N. Y. 92; *Bell* v. *Little,* 204 App. Div. 235; *Hynes* v. *Title Guar. & Trust Co.,* 273 N. Y. 612; *Brown* v. *Brown,* 242 App. Div. 33; *Krause* v. *Krause,* 282 N. Y. 355.) II. The conduct of decedent estopped him and his distributees from denying the marital status. (*Petit* v. *Petit,* 45 Misc. 155; *Matter of Rechtschaffen,* 278 N. Y. 336.)

DESMOND, J. Petitioner-respondent, Elisabeth S. Rathscheck, married Edgar R. Rathscheck, decedent above named, in 1933. In 1944, while both were residents of New York City, petitioner brought a suit against her husband, in a Mexican court, for an absolute divorce. Neither party went to Mexico at any time, but both joined by mail in the arrangements for the Mexican proceedings. Mrs. Rathscheck's petition was presented to the Mexican tribunal by an attorney representing her, and an answer, admitting the petition's truth and joining in the prayer for a divorce, was filed on behalf of the husband. The Mexican court then handed down a decree, dated May 19, 1944, declaring that the marriage was " in all its legal effects dissolved ". It is conceded here that this " mail-order " judgment was totally void in New York (*Vose* v. *Vose,* 280 N. Y. 779; *Querze* v. *Querze,* 290 N. Y. 13). In 1946, respondent brought a second suit for divorce against her husband, on personal service, this time in Queens County, New York, and in that second suit she asked for and obtained, after her husband had defaulted in pleading, an interlocutory judgment which held the Mexican divorce

void, and again decreed a dissolution of the marriage. Before that New York State divorce judgment could become final, however, the husband died, leaving no will. There is evidence that at some time between the Mexican proceedings and the New York divorce suit, the parties lived together in New York City.

Mr. and Mrs. Rathscheck never had children, so the net estate must go, under our Decedent Estate Law, either to petitioner, or to collateral relatives whose interests, since they are non-resident aliens, are now represented by the Attorney General of the United States under a " Vesting Order ", made a few days after the entry of the Surrogate's decree, hereafter described. A special guardian, who acted for some of those collateral relatives, took the position, on this accounting in the Surrogate's Court, that Elisabeth Rathscheck was, under the facts above summarized, barred from taking a distributive share of this estate, by subdivision (b) of section 87 of the Decedent Estate Law, which is as follows: " No distributive share of the estate of a decedent shall be allowed under the provisions of this article   *   *   *   to a spouse who has procured without the state of New York a final decree or judgment dissolving the marriage with the decedent, where such decree or judgment is not recognized as valid by the law of this state ". The Surrogate concluded that the statutory language just quoted means what it says, and that it fixes the position of this petitioner who, according to the undisputed facts, had " procured without the state of New York a final decree or judgment dissolving the marriage with the decedent " which decree " is not recognized as valid by the law of this state ". The Surrogate therefore disallowed Mrs. Rathscheck's claim for a widow's distributive share, and ordered the net estate turned over to the collateral relatives, or to the Alien Property Office for their benefit.

On appeal by petitioner, the Appellate Division took a different view, holding, on grounds we will state hereafter, that the words of subdivision (b) of section 87: " decree or judgment   *   *   *   not recognized as valid by the law of this state " did not include within their meaning a " mail-order " divorce obtained in a foreign country and that, accordingly, since Mrs. Rathscheck, at the time of this decedent's death, was still his wife, there was no impediment to the award to her of a widow's share of his estate.

We agree with the Surrogate that subdivision (b) of section 87 is so plain and clear as not to need or permit any construction (see *Matter of Hering* v. *Clement*, 196 N. Y. 218; *Matter of De Peyster*, 210 N. Y. 216, 225; *Matter of Tishman* v. *Sprague*, 293 N. Y. 42, 50). " It is not allowable to interpret what has no need of interpretation, and when the words have a definite and precise meaning, to go elsewhere in search of conjecture in order to restrict or extend the meaning." (*McCluskey* v. *Cromwell*, 11 N. Y. 593, 601.) Our Legislature has made it the law that one who has procured, outside this State, a divorce not recognized here as valid, may not have a distributive share of her spouse's estate. No court may refuse to enforce the statutory penalty for that interdicted conduct.

The argument for petitioner is based on a statement in a note or report (see Combined Reports of Decedent Estate Comm., Reprint, p. 202; McKinney's Cons. Laws of N. Y., Book 13 [1949 ed.], p. 482), made to the Legislature by the Commission to Investigate Defects in the Law of Estates at the time the commission recommended the enactment of subdivision (b) of section 87, and which recommendation the Legislature adopted in 1929. The note said that the whole of section 87 is " new " and that, " without limitation as to effect, it [section 87] is intended to be a declaration of the existing law ". Apparently to show what " existing law " was referred to, the note then cited *Matter of Ensign* (103 N. Y. 284); *Matter of Albrecht* (118 Misc. 737, 119 Misc. 554); *Starbuck* v. *Starbuck* (173 N. Y. 503); and *Monroe Co. Sav. Bank* v. *Yeoman* (119 Misc. 226). The *Ensign* and *Albrecht* cases (*supra*) deal with the effects of *valid* divorces, so were, presumably, mentioned by the commission in connection with its recommendation of the adoption of the first subdivision (a) of proposed section 87, and have no relevance to our question here. *Starbuck* v. *Starbuck* (*supra*) and *Monroe Co. Sav. Bank* v. *Yeoman* (*supra*) were, however, decisions as to the rights of wives who went from New York into other States and obtained divorce decrees not valid here. Both cases denied dower to the wives, the *Starbuck* opinion putting it on the ground of estoppel: that is, that the wife, after procuring the decree, could not be heard to question its effect. *Monroe Co. Sav. Bank* v. *Yeoman*, while

citing the *Starbuck* holding, stated the rationale a little differently: that is, that the foreign divorce, while not binding on the husband, nevertheless brought it about that the marriage was completely dissolved as to the wife.

Petitioner's argument here, from the commission's note and its citation of those earlier cases, runs like this: those cases held to be estopped, from claiming the benefits of continued marital status, one who procured an invalid divorce in a sister State; however, the argument goes on, a totally void Mexican divorce is so entirely without effect in New York that it estops no one in any subsequent situation (citing *Caldwell* v. *Caldwell*, 298 N. Y. 146). So, says petitioner, the commission must have meant, by citing the *Starbuck* and *Monroe Co. Sav. Bank* cases (*supra*), to attach the penalty of disinheritance only to persons procuring invalid sister State decrees, and not similarly to punish those who, by mail, got themselves worthless papers styled " divorces ", but issued by a Mexican court without any jurisdiction over the marriage status or the parties.

Of course, all that reads into subdivision (b) of section 87 matter which is not there, and ascribes to the Legislature the making of a distinction between " invalid " and " void " divorces, a distinction not stated or suggested in the statute. We go further and say that there is nothing to show that the commission itself in writing the note above quoted from, had in mind any such distinction, or any difference between purported but ineffective divorces obtained in another State, and purported but ineffective divorces gotten from a court in a foreign country. The language of the statute as recommended and passed: " not recognized as valid by the law of this state " describes any or all of such decrees, and there is no showing that the commission or the Legislature proposed to make fish of one kind, and flesh of another.

If this statute were of doubtful meaning, we could, we assume, look for help to the commission's " petition ", or report to the Legislature (see *Furman* v. *Mayor of City of N. Y.*, 5 Sandf. 16, affd. 10 N. Y. 567), but even then no such help would be forthcoming. The distinction between invalid sister State divorce judgments, and void mail-order Mexican divorces, in that the former result in estoppels and the latter do not, was most recently and most definitely stated by this court

in *Caldwell* v. *Caldwell* (298 N. Y. 146 [1948], *supra*) decided nineteen years after subdivision (b) of section 87 first saw the light of day in 1929. The total invalidity, for all purposes including estoppel, of divorces granted pursuant to Mexico's peculiar laws, had been earlier determined by this court in 1939, in *Vose* v. *Vose* (280 N. Y. 779, *supra*) and in *Querze* v. *Querze* (290 N. Y. 13 [1943], *supra*). But, so far as we can find, the nullity of such Mexican divorces first became the subject of judicial decision in this State in 1930 in *Matter of Alzmann* v. *Maher* (231 App. Div. 139, 141) handed down in 1930, or, at least, that is the earliest of the decisions cited to this court in the *Vose, Querze* and *Caldwell* briefs on appeal. It is, therefore, a practical, if not an absolute impossibility, that the Legislature in 1929 had in mind or intended any differences between Mexican divorce decrees and other invalid divorce decrees.

We conclude that subdivision (b) of section 87 is a bar to any award to petitioner, by the Surrogate, of a share in this intestate's property.

The decree of the Surrogate's Court entered on the remittitur from the Appellate Division should be reversed and the original decree of the Surrogate's Court, dated June 22, 1948, reinstated, with costs to the appellant in this court and in the Appellate Division, payable out of the estate. The appeal from the Appellate Division order should be dismissed, without costs.

FULD, J. (concurring). I agree that the plain language of subdivision (b) of section 87 of the Decedent Estate Law permits us no choice but to reverse and to disallow the claim of petitioner wife. (See, also, Decedent Estate Law, § 18, subd. 3.) And, since that is so, the court can only remark the seeming injury to the sense and symmetry of the law. We have previously held that a wife who procures a " mail-order " decree of divorce in Mexico has nothing, so long as her mate lives, but a scrap of paper. (See, e.g., *Caldwell* v. *Caldwell*, 298 N. Y. 146; *Querze* v. *Querze*, 290 N. Y. 13.) By our present decision, we are holding that the " husband's " death converts that scrap of paper into a decree of disinheritance.

To those who seek certainty and uniformity in the law, the result cannot help but be perplexing and disappointing, for no logic can account for the variant conclusions reached. The

explanation, though, is to be found in the haphazard and piecemeal handling of a problem so ramified and complex as that of marriage and divorce. A different approach, a different method, is required if there is to be a solution. If the courts could wipe clean the slate and start afresh, they might evolve a coherent pattern in our law of domestic relations. That, however, is impossible and, accordingly, it is to the legislature that we must turn. (Cf. *Williams* v. *North Carolina,* 317 U. S. 287, 305, per FRANKFURTER, J., concurring.)

If so minded, the legislature may enact comprehensive legislation dealing broadly with the subject of " divisible divorce " and its aftermath. Or, if it deems it sufficient merely to put an end to the " mail-order " decree of divorce — procured in Mexico or any other jurisdiction — it may enact laws more limited in scope. At any rate, whatever the ultimate solution, whether it is to be found in general or specific remedies, judicial correctives of the sort urged by Judge CONWAY in his opinion to affirm do not supply the answer; such correctives must of necessity deal with fragments of the problem and can only succeed in further complicating an already chaotic situation.

I am persuaded, in short, that subdivision (b) of section 87 of the Decedent Estate Law must be read as it was written; it cannot be subjected to any corrective gloss by this court.

CONWAY, J. (dissenting). This is an accounting proceeding in which is sought a determination that by reason of a so-called Mexican " mail-order divorce " the accounting administratrix was not entitled to be a distributee of her deceased husband's estate and that as a result the decedent's next of kin, all of whom are citizens and residents of Germany, are entitled to take his entire estate.

The statute which we must construe is subdivision (b) of section 87 of the Decedent Estate Law which provides as follows: " No distributive share of the estate of a decedent shall be allowed under the provisions of this article * * * to a spouse who has procured without the state of New York a final decree or judgment dissolving the marriage with the decedent, where such decree or judgment is not recognized as valid by the law of this state; * * *."

We are all agreed that at the time the statute was enacted in 1929, the Legislature did not have in mind Mexican " mail-order

divorces ''. That is borne out by the note of the commission which reads in part as follows: '' New. Without limitation as to effect, it is intended to be a declaration of the existing law.'' It is further borne out by the cases cited in the note of the commission, all of which involved divorce actions in sister States. The only cases cited affecting *invalid* divorce decrees were *Starbuck* v. *Starbuck* (173 N. Y. 503) and *Monroe Co. Sav. Bank* v. *Yeoman* (119 Misc. 226) which involved attempted divorces in Massachusetts and Ohio respectively. Prior to 1929, the law was settled that a wife, who had obtained a divorce decree in a sister State not recognized as valid by this State, was estopped to deny its validity and could assert no right of dower in the estate of her deceased spouse. (*Starbuck* v. *Starbuck, supra; Monroe Co. Sav. Bank* v. *Yeoman, supra;* see, also, *Matter of Morrison,* 52 Hun 102, affd. 117 N. Y. 638; *Matter of Swales,* 60 App. Div. 599, affd. 172 N. Y. 651.)

In amending the Decedent Estate Law in 1929, the Legislature granted to a surviving spouse the right to a distributive share of the estate of the deceased spouse, but, in subdivision (b) of section 87, accompanied that right with the then existing common-law limitation that a spouse who had procured an invalid divorce decree in a sister State was estopped to deny its validity. The Legislature did not use the word '' estoppel '' but that is the obvious substance and purpose of subdivision (b) of section 87 as indicated by the quoted commission note.

The attempt here, therefore, by the Attorney General is to have subdivision (b) of section 87, a true estoppel statute, stretched so that it may cover a situation not intended to be covered therein and not within the contemplation of the Legislature when it was enacted, for it is only since the enactment of subdivision (b) of section 87, and since 1929, that we decided the cases of *Vose* v. *Vose* (280 N. Y. 779); *Querze* v. *Querze* (290 N. Y. 13), and *Caldwell* v. *Caldwell* (298 N. Y. 146) in which we held that a Mexican mail-order divorce estopped no one and was but a worthless piece of paper.

We had the same question presented to us in *Caldwell* v. *Caldwell* (*supra*). We posed that question in the first paragraph of our opinion as follows (p. 147): '' We have presented to us the question of whether any effect may be given by our courts to a divorce obtained by mail from a court of a foreign nation at the

instance of one domiciled in this State." We went on to answer it and determined for the reasons therein stated, that the mailing of a collusive agreement violating our declared public policy (Domestic Relations Law, § 51, forbidding any " contract to alter or dissolve " a marriage by a husband and wife) and obtaining in return in the mail a paper purporting to be a " divorce " might not be the foundation for the creation of any rights; that there was not the slightest semblance or color of jurisdiction justifying action by the Mexican court; that its purported decree was wholly valueless; that it was a nullity from which no rights of any kind might spring and that neither party was estopped in any manner. The same method used in *Caldwell* v. *Caldwell*, has again been used, except that here the parties: first, disregarded their " mail-order divorce " obtained in 1944, by continuing to live together as husband and wife until 1946, and, second, had our Supreme Court in Queens County declare it void and *of no effect* in a decree after personal service upon the deceased and a general appearance by him.

In our State, marriage, while a civil contract, confers a status upon those who enter into it, and the State is interested in the creation, continuance and dissolution of that status. Seventy-five years ago, we said: " It partakes more of the character of an institution regulated and controlled by public authority, upon principles of public policy, for the benefit of the community." (*Wade* v. *Kalbfleisch*, 58 N. Y. 282, 284.) As a result, the People through their legislative representatives have declared the applicable public policy of our State in section 51 of the Domestic Relations Law, and have forbidden any " contract to alter or dissolve " a marriage by a husband and wife.

Under our system of law, in the United States, judicial power to grant a divorce is based upon domicile. Without that, there is no jurisdiction to act. (*Williams* v. *North Carolina*, 317 U. S. 287, 325 U. S. 226; *Caldwell* v. *Caldwell*, 298 N. Y. 146, 149, *supra.*) That does not mean, of course, that by comity and under circumstances which do not offend the public policy of this State, we may not recognize divorces granted in foreign countries to one residing there even though domiciled here. We have accorded such recognition but only when it was not contrary to our declared public policy. (*Gould* v. *Gould*, 235 N. Y. 14, 29 [1923].)

By reversing, we depart from the basic reasoning of the *Querze* and *Caldwell* cases (*supra*) — a departure limited to a narrow class of cases, but, nonetheless, a departure. We now say that a Mexican mail-order divorce, obtained pursuant to a collusive agreement violating the public policy of our State, nevertheless, may be the foundation for the exclusion of the surviving husband or wife from a distributive share in the estate of the deceased.

By reversing, we make it necessary for an attorney to advise a client (cf. *Caldwell* v. *Caldwell, supra,* p. 147; *Matter of Anonymous,* 274 App. Div. 89) in a contemplated application for a Mexican mail-order decree based solely upon a collusive contract violating our State public policy, that if both enter into such contract (since both must agree and sign) the client will insure the fact that if the marital partner survives, that partner will have no distributive share in the client's estate. An attorney will be under the necessity of advising his client that if he or she disregards the public policy of this State and enters into such a collusive contract to dissolve the marriage and obtains a mail-order divorce upon it, while it will not affect the marriage obligation in this State, it will immediately put into operation and fix forever rights of descent and distribution of the survivor of the two spouses; that that will be true regardless of what either or both of them may do thereafter and regardless even of a decree of our Supreme Court declaring the Mexican mail-order divorce void and *of no effect,* upon direct attack with personal jurisdiction of both parties. There may be no repentance.

The order should be affirmed, with costs.

LOUGHRAN, Ch. J., LEWIS, DYE and FROESSEL, JJ., concur with DESMOND, J.; FULD, J., concurs in separate opinion; CONWAY J., dissents in opinion.

Ordered accordingly.