# IN RE ESTATE OF IAN A. PRINGLE, Deceased

Probate No. 86/1998

Territorial Court Of The Virgin Islands,

Division of St. Croix

July 25, 2000

MARISE C. JAMES, ESQ., Christiansted, St. Croix U.S.V.I., *for the Petitioner*

LOLITA PAIEWONSKY, ESQ., Christiansted, St. Croix, U.S.V.I., *Court appointed Guardian for Seymour and Ayanna Pringle*

15

ANDREW L. CAPDEVILLE, ESQ., GWYNNETH. MOOLENAAR, ESQ., St. Thomas, U.S.V.I., *for the Respondents*

STEELE, *Judge*

## MEMORANDUM OPINION

(July 25, 2000)

This matter came before the Court for hearing on both February 14, 2000 and April 5, 2000. What had been initiated as a show cause hearing concerning the administration of the Estate, soon escalated into allegations of deceit, perjury, illicit transfer of property and false heirship. In fact, by the conclusion of the hearing, the issue as to who should serve as the administrator had been mutually agreed upon by the parties. In its place, arose the dispute over the validity of a foreign divorce decree and the marital status that Bernadette Pringle (hereinafter "Petitioner") shared with Ian A. Pringle (hereinafter "Decedent") at the time of his disappearance.

It was maintained by the Petitioner that the divorce decree was a farce, with the foreign court lacking the proper jurisdictional authority to grant such a dissolution. She points to the fact that even after the decree was issued, she and the Decedent continued to reside in the same household as husband and wife. In opposition, the Respondents, Sophia Pringle Francis, Gizelle LaRonde, Letitia Butler, Ayanna H. Pringle, and Seymour Pringle, as heirs to the Decedent, assert that the Petitioner and the Decedent were indeed divorced. It is their contention that the continued relationship following the divorce was merely business related.

The issue garnering the most attention from the Court is the standing of the Petitioner to even initiate this probate action. Should it be determined that she is not the surviving spouse of the Decedent for inheritance purposes, the Petitioner will have no claim to a percentage of the Estate. With this in mind, the Court shall first address whether the foreign nation divorce decree is to be recognized in this jurisdiction. In the event such recognition is not warranted, a determination will be made concerning the effect an invalid decree has on inheritance rights. Afterwards, the Court shall briefly discuss the alleged mismanagement of Estate property, which was brought to light during the hearing.

16

# I. FACTUAL BACKGROUND

Several pertinent facts in this case are not in dispute. On May 2, 1996, the Decedent piloted a commercial airplane from St. Croix in route to the island of Dominica. However, the Decedent, along with the two passengers accompanying him on this flight, never arrived at their final destination. A search was conducted for the missing aircraft, but to no avail. Based on this information and the affidavit of the Petitioner which asserted that she had not heard from or seen the Decedent since his disappearance, the Court declared the Decedent dead on January 21, 1999.

The Petitioner and the Decedent were wed in St. Thomas on January 23, 1978. Relying on this marital contract, the Petitioner sought to be appointed Administratrix for the Estate as the surviving spouse. However, the Petitioner failed to inform this Court of the Dominican Republic divorce decree that the couple had mutually consented to and were eventually granted on April 14, 1980. Furthermore, she neglected to mention her involvement in the 1994 investigation of the Decedent's taxes, in which the Petitioner told an officer of the Internal Revenue Bureau that she and the Decedent were divorced.

Following the 1980 divorce, the Petitioner continued to reside in the same home as the Decedent, share in his various business ventures, and subsequently, gave birth to two of his seven children. During this time, the Decedent also maintained intimate relations with numerous other women and fathered additional children. No attempt was made on the part of the Decedent to conceal any of his relationships. In fact, for several years the Decedent spent his weekends in Dominica living with one of these women and their child. The Petitioner's own testimony confirmed that she knew of this living arrangement while it was ongoing.

On the date of his disappearance, the Decedent owned interests in three separate businesses. Two of the businesses are located on St. Croix, namely DomTrave Airways, Inc. (hereinafter referred to as "DomTrave") and Tropical Merchandise, Inc. (hereinafter referred to as "Tropical"). The third business, Lucy's Supplies Limited (hereinafter referred to as "Lucy's"), was situated in Dominica, but has since been closed. In addition to two airplanes, the Decedent owned a home in St. Croix, as well as one in Dominica.

## II. DISCUSSION

The ultimate outcome of this controversy will necessarily hinge on what effect the Dominican Republic divorce decree will have on the Petitioner's status as an heir. According to the Petitioner, the 1980 divorce was secured merely to please one Edwina Josephine Lewis, who resided in Dominica. The Decedent apparently wanted Ms. Lewis, with whom he shared a love interest, to manage his business affairs on Dominica. However, she refused to do so until such time as she was presented with sufficient evidence that the Decedent was no longer married, thus the need for the decree. The Petitioner claims to have relied upon the Decedent's assurance that the foreign divorce would have no bearing on her marriage unless the document was physically filed in the Virgin Islands.

The Respondents contend that the Decedent considered himself to be divorced. Not only do they rely on the decree itself, but they point to the playboy lifestyle which the Decedent maintained once the divorce was entered.

The record is fraught with conflicting testimony as to who slept where in the Decedent's house, and whether the Petitioner and the Decedent utilized separate closets to store their clothing. Numerous individuals provided testimony and presented affidavits attesting to how the couple portrayed themselves to the public. While such evidence might very well be relevant were this a common law marriage jurisdiction, none of this information is truly pertinent considering the applicability of 15 V.I.C. § 87 to this matter. Original jurisdiction to supervise and administer an estate has been bestowed upon the Court pursuant to 4 V.I.C. § 76(a). V.I. Code Ann. tit. 4, § 76 (1997).

### A. Foreign Nation Divorce Decree

▮▮▮The Constitution of the United States requires that our Territory grant full faith and credit to a judgment of a U.S. State.[1] *See Perrin v. Perrin*, 7 V.I. 21, 26, 408 F.2d 107, 109 (3d Cir. 1969). However, judgments from a foreign nation do not garner this same type of treatment. Instead, the principles of comity are utilized, with our courts extending a prima facie validity to such foreign judgments. *See Perrin*, 7

---

[1] U.S. Const. art. IV § 1, as made applicable to the Virgin Islands pursuant to Section 3 of the Revised Organic Act of 1954.

V.I. at 26, 408 F.2d at 109; *Caldwell v. Caldwell*, 298 N.Y. 146, 149, 81 N.E.2d 60, 62 (N.Y. 1948). It is unquestionable that a valid divorce decree will serve to sever whatever inheritance right an individual had by law to receive a distributive share of their former spouse's estate.[2] Therefore, it must be determined whether recognition of the Dominican Republic divorce decree would offend public policy of the Virgin Islands.

### 1. Validity of Divorce Decree

Whether recognition is to be granted a divorce decree entered into by a foreign nation is not a novel issue before the Territory. *See Perrin*, 7 V.I. 21, 408 F.2d 107 (3d Cir. 1969). The court in *Perrin* found that recognition of a bilateral Mexican divorce would not offend public policy. The spouse procuring the divorce appeared personally in the Mexican proceeding, while her husband appeared by a duly empowered attorney at law. *Id.* at 23, 29, 408 F.2d at 108, 111. Significant emphasis was apparently placed upon the aspect of physical presence in the foreign forum. Although merely dictum, the court stated that "mail order" divorce decrees in which neither spouse appeared personally in the foreign jurisdiction would certainly not be recognized in the Virgin Islands. *Perrin*, 7 V.I. at 26, 408 F.2d at 109.

In the case at hand, neither the Decedent nor the Petitioner were domiciles or even residents of the Dominican Republic when the divorce decree was issued. While the decree itself purports that the Decedent was momentarily in the Dominican Republic, the uncontroverted evidence presented before the Court does not support this assertion. In order to obtain their divorce, the Petitioner testified that she and the Decedent traveled to Puerto Rico where they met with the Office of Consulate General of the Dominican Republic. At no time did either party visit the Dominican Republic in reference to their divorce until the Petitioner personally went there to retrieve the decree.

---

[2] 15 V.I.C. § 87 provides in part that:

> No distributive share of the estate of a decedent shall be allowed under the provisions of this chapter, either —
>
> (1) to a spouse against whom or in whose favor a final decree or judgment of divorce recognized as valid by the law of this territory has been rendered...

V.I. Code Ann. tit. 15, § 87 (1996).

Though a similar scenario was alluded to in *Perrin*, these remarks were actually beyond the scope of facts presented before that court, and are thus not binding in subsequent cases as legal precedent. Nevertheless, this does not prevent our Court from apportioning much weight to the astute insight provided by this case. In addition, further guidance was received in the form of non-controlling case law which had directly addressed the physical absence of the parties in the foreign nation which had entered their divorce decree. Of this case law, special attention was focused towards New York precedent, as Section 87 of Title 15 of the Virgin Islands Code was in fact suggested by section 87 of the former New York Decedent Estate Law (repealed by L. 1966, ch. 952, eff. Sept. 1, 1967). V.I. Code Ann. tit. 15, § 87 (1996) (see editor's revision notes immediately following the text of 15 V.I.C. § 87).

A "mail-order divorce" has been defined as a situation where two persons attempt to confer jurisdiction upon a court of a foreign nation by executing a power of attorney to counsel who resides in that foreign nation and then forwarding such instruments by mail without ever visiting the nation or establishing their domicile there. *Caldwell*, 298 N.Y. at 150, 81 N.E.2d at 62. Such divorces are null and void as the foreign court has no scintilla of jurisdiction when neither party was ever in that country. *Id.* at 150, 81 N.E.2d at 62; *Rosenbaum v. Rosenbaum*, 210 A.2d 5, 7 (D.C. 1965); *see also In Re Cohen*, 10 N.J. 601, 93 A.2d 4, 5 (N.J. 1952) (citing the well settled principle that Mexican mail-order divorce decrees obtained merely on signed waivers of jurisdiction without the personal appearance in the foreign nation of either the husband or wife are complete nullities in New Jersey).

The courts in New York have held that mail-order divorces are so patently invalid that they do not estop a person who has procured one from commencing an action to have his or her marital status judicially determined. *E.g. Dorn v. Dorn*, 202 Misc. 1057, 112 N.Y.S.2d 90, 92 (N.Y. Sup. Ct. 1952). However, these types of divorces may be divided into two separate categories. *Considine v. Rawl*, 39 Misc. 2d 1021, 242 N.Y.S.2d 456, 458 (N.Y. Sup. Ct. 1963). The first category consists of cases where the plaintiff seeks to reestablish the former marital status. Included in this reestablishment are any financial benefits which are merely incidental to the status, such as support and alimony. *Id.* 242 N.Y.S.2d at 459. The New York court's reasoned that such benefits derive from statute and not from the common law. *See Considine*, 242

N.Y.S.2d at 459; *Dorn*, 112 N.Y.S.2d at 93. The second category involves those cases where the plaintiff attacks the divorce primarily for the purpose of obtaining financial gain. *Considine*, 242 N.Y.S.2d at 458. Application of the doctrine of estoppel to this category will only deny the person guilty of misconduct from benefitting financially, and will not serve to validate the mail-order decree of the foreign nation. *Id.* 242 N.Y.S.2d at 459.

Although the New York cases previously cited specifically dealt with Mexican mail-order divorce decrees, the rationale utilized in these decisions is equally applicable to similar decrees which are received from any foreign nation. Upon concluding our review of case law from other jurisdictions as well as our own, it is clear to the Court that the Dominican Republic divorce decree voluntarily entered into by the Decedent and the Petitioner may not be recognized in the Virgin Islands as terminating the marital vows. This determination must be made even though the Court does not perceive the Petitioner to be the innocent and naive party that she now claims to have been during the divorce process. For quite some time, the Petitioner has been actively involved in managing business entities. By all accounts, it appears that she is an astute entrepreneur, as was the Decedent during his lifetime.

It is the belief of the Court, and indeed the apparent testimony of the Petitioner, that the divorce was concocted for unsavory business purposes. In short, it was meant to deceive Edwina Josephine Lewis. The Petitioner and the Decedent shared what can best be described by the Court as a marriage of convenience. This relationship was more along the lines of a business partnership rather than that of a marriage. While it is true that the Petitioner gave birth to two of the Decedent's children after the divorce occurred, several other children were fathered by the Decedent during this same period. It is the opinion of the Court that the Decedent not only sought trustworthy individuals to manage his business interests, but also ones he could control emotionally. The fact that he chose to secure many of his possessions in his name alone is not merely coincidence. The Court finds that such decisions were consciously devised by the Decedent. He filed his income tax returns as a single person. Even the title to the home he shared with the Petitioner is only in his name.

The Court fully believes that the Petitioner knew of the consequences of the divorce action. Whether she agreed to this termination for

21

questionable business tactics or simply to continue her relationship with the Decedent does not concern the Court. The public policy of the Virgin Islands would surely be offended were the Territory to allow its citizens to obtain unenforceable sham divorces. Nevertheless, the lack of physical presence by either the Decedent or the Petitioner in the Dominican Republic during the divorce restricts the Court from recognizing what should otherwise be a valid divorce decree.

## 2. Procurement of an Invalid Divorce Decree

Merely finding that the Dominican Republic divorce decree is invalid in the Virgin Islands does not assure that the Petitioner may assume her rights as the Decedent's surviving spouse for inheritance purposes. It is true that a surviving spouse will normally be entitled to receive one-third (1/3) of the decedent's estate if the decedent is also survived by descendants. V.I. Code Ann. tit. 15, § 84(1) (1996). However, the Virgin Islands Code has specified certain actions which if performed by a spouse will deprive that individual of his or her distributive share. *See* V.I. Code Ann. tit. 15, § 87 (1996). In particular, one such situation deals with the procurement of a foreign divorce decree not recognized as being valid in the Territory. Specifically, subsection (2) of this section provides that:

> No distributive share of the estate of a decedent shall be allowed under the provisions of this chapter, either —
>
> (2) to a spouse who has procured without this territory a final decree or judgment dissolving the marriage with the decedent, where such decree or judgment is not recognized as valid by the law of this territory; ...

V.I. Code Ann. tit. 15, § 87(2) (1996).

An examination of controlling precedent reveals no case law which directly addresses 15 V.I.C. § 87(2).[3] Therefore, the Court shall rely on our learned brethren from New York to assist us in the proper application of this subsection. As was mentioned earlier in this opinion, Section 87

---

[3] Subsection (2) of section 87 was briefly alluded to in *Zawadski De Bueno v. Bueno Castro*, 822 F.2d 416 (3d Cir. 1987), however, this Code section did not figure into the decision, nor did the court choose to discuss its structure.

finds its origin through New York's former Decedent Estate Law.[4] Review of subdivision (b) of this State's previous law discloses that its substance is basically identical with that of the Virgin Islands current subsection (2).[5]

The Court of Appeals of New York found the statutory language of subdivision (b) of section 87 to be so plain and clear as to not require or even permit construction. *In Re Rathscheck's Estate*, 300 N.Y. 346, 350, 90 N.E.2d 887, 888 (1950). It is obvious that the New York Legislature intended that one who has procured, outside the State, a divorce not recognized as valid, may not have a distributive share of his or her spouse's estate. Furthermore, no court may refuse to enforce the statutory penalty for such conduct. *Id.* at 350, 90 N.E.2d at 889.

Even though a foreign judgment is not recognized in the jurisdiction as dissolving the marriage of the parties, it is still effective to bar the spouse who had obtained it from sharing in the estate of the deceased spouse. *In Re Chomsky's Estate*, 101 N.Y.S.2d 60, 61 (N.Y. Sur. Ct. 1950). The Judiciary of New York have had several occasions in which to enforce this particular inheritance bar. *See Rathscheck, 300 N.Y. 346, 90 N.E.2d 887 (1950)* (barring petitioner from sharing in the intestate's property where neither party had traveled to Mexico, but both had joined by mail in arranging and obtaining a Mexican divorce decree); *In Re Raleigh's Estate*, 22 Misc. 2d 705, 204 N.Y.S.2d 224 (N.Y. Sur. Ct. 1960) (denying objectant a distributive share of the decedent's estate where objectant had procured a Mexican divorce from the decedent without any personal appearance by either party in Mexico); *In Re Chomsky's Estate*, 101 N.Y.S.2d 60 (N.Y. Sur. Ct. 1950) (respondent who procured "Mexican mail-order decree" denied distributive share of the decedent's estate); *In Re Mane's Estate*, 40 Misc. 2d 805, 244

---

[4] It should be noted that although New York repealed its section 87 effectively in 1967, the essence of subdivision (b) of this section was preserved in EPTL 5-1.2(a)(3). N.Y. EPTL § 5-1.2 (Consol. 1999). Therefore, the Court is not limited to utilizing New York cases rendered prior to 1967.

[5] Subdivision (b) of section 87 of New York's former Decedent Estate Law provides that: No distributive share of the estate of a decedent shall be allowed under the provisions of this article *** to a spouse who has procured without the state of New York a final decree or judgment dissolving the marriage with the decedent, where such decree or judgment is not recognized as valid by the law of this state.

*See In Re Rathscheck's Estate*, 300 N.Y. 346, 349, 90 N.E.2d 887, 888 (1950).

N.Y.S.2d 183 (N.Y. Sur. Ct. 1963) (entering a voluntary appearance in a foreign divorce, the cross-petitioner was found to have assisted in the procurement of the divorce and was therefore barred from receiving a distributive share of the estate).

It is apparent from the New York case law that the lack of physical presence in the foreign jurisdiction of the divorce decree by either party will not impede the termination of inheritance rights. Thus, termination will depend on the procurement requirement of the code section. An accused spouse will be found to have not procured the divorce decree where he or she did not affirmatively participate in the divorce. *Mane*, 244 N.Y.S.2d at 184. However, where a divorce is obtained by amicable arrangement, with each spouse desiring to terminate the marriage and each taking affirmative action to accomplish that result, it cannot be said that only one spouse is the procurer of the divorce. Where a decree was procured by the voluntary appearance of a spouse and the decree recited an agreement of the parties, that spouse cannot be regarded as an innocent party who has been imposed on. As each party sought the termination of their marriage, each should accept the consequences of their actions. *Mane*, 244 N.Y.S.2d at 184.

In the matter at hand, the Petitioner testified that she and the Decedent went to Puerto Rico and visited the Office of Consulate General of the Dominican Republic for the purpose of obtaining a divorce decree. According to the Petitioner however, it was the Decedent's idea to get the divorce. She maintains that she was initially hesitant to agree to such a termination, but did so on the Decedent's assurance that the divorce was for business purposes and would have no effect on their marital status unless filed in the Virgin Islands. The Petitioner even claimed to have lied to the Consul General in order to receive the decree. She supported the notion of a sham divorce with the fact that the couple continued to live together for an additional sixteen (16) years after the entry of the decree. Indeed, the Decedent went on to provide for the Petitioner's well-being, and they eventually had two children together.

Even if the Petitioner's allegations of deception were accepted as true, the Court would still find that she was barred from receiving a distributive share of the Decedent's Estate pursuant to 15 V.I.C. § 87(2). Similar to the cross-petitioner in *Mane*, the Petitioner voluntarily chose to appear in the divorce action. In fact, the Dominican Republic divorce was obtained by utilizing a procedure where both parties mutually

24

consented to the action. The mere presence of the Petitioner at the Consul General's office is a sufficient act in furtherance of the divorce. More damaging is the testimony elicited from the Petitioner herself. She admitted to lying to the Office of the Consulate General in order to obtain the divorce. It is abundantly clear to the Court that such an affirmative act was conducted to assist in the procurement of the divorce. No matter which party initiated the proceedings, each played an active role in the procurement. An absence of participation from either party would have frustrated the Dominican Republic action. As such, the Court holds that both the Petitioner and the Decedent procured the divorce decree. The fact that neither individual was physically present in the Dominican Republic is of no consequence.

### B. Possible Mismanagement of Estate Property

Since this matter originated upon the Petitioner's request to be appointed administratrix for the Estate, testimony was heard from several witnesses concerning how the Petitioner has managed the Decedent's property from the date of his disappearance. However, just prior to the conclusion of the hearing, the issue of administration was amicably resolved amongst the parties. The Court is well aware that the Respondents have suggested that the Petitioner has not acted in the best interest of the Estate in regards to her handling of the Decedent's business affairs. Such suggestions of mismanagement include the Petitioner opening a seemingly identical business to Lucy's on the island of Dominica soon after the closure of Lucy's and the apparent creation of a business on St. Croix that could be viewed as a competitor to Tropical.

While the Court agrees that this conduct on the part of the Petitioner appears questionable, this is not the appropriate time to address these concerns. Should the Respondents wish to pursue this matter, they will need to do so through the Estate's Administrator pursuant to either 15 V.I.C. § 318 or 15 V.I.C. § 320.

### III. CONCLUSION

Putting aside all of the subplots and innuendos which accompanied this action, the Court is ultimately left with the decision of determining what effect a 1980 Dominican Republic divorce decree will have on the Petitioner's right to receive a distributive share of the Decedent's Estate. A means to resolve such a situation has been provided by the Code

through the clear language of 15 V.I.C. § 87. As neither the Petitioner nor the Decedent were ever physically present in the Dominican Republic during the divorce proceedings, the decree may not be recognized through the principle of comity.

Nevertheless, a divorce decree does not have to be recognized by the Territory to prevent the procuring spouse from receiving a distributive share of the decedent's estate. Furthermore, both spouses may be found to have procured the decree if each performed affirmative actions in the furtherance of the divorce. As the Petitioner admitted that she voluntarily appeared and mutually consented to the divorce, the Court finds that she in fact procured the decree along with the Decedent. Thus, she is barred from receiving a spouse's distributive share of the Estate.

As for the Respondents' suggestions that the Petitioner has mismanaged Estate property, no decision shall be forthcoming from the Court at this time. Any concerns regarding this matter must first be pursued through the Estate's Administrator.